## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| **In re:** | :    **Chapter 11** |
| | : |
| **CRAFTWORKS PARENT, LLC,** *et al.*, | :    **Case No. 20-10475 (___)** |
| | : |
| **Debtors.**[1] | :    **(Joint Administration Requested)** |
| | : |

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF

CraftWorks Parent, LLC ("CW Parent") and its debtor affiliates, as debtors and debtors in possession (collectively with CW Parent, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully represent in support of this motion (the "Motion") as follows:[2]

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Big River Breweries, Inc. (6292); Brew Moon Colorado, Inc. (5001); Chophouse License, LLC (2340); Craft Brewery Holding, Inc. (1228); CraftWorks Holdings, LLC (7163); CraftWorks Intermediate Co, LLC (9810); CraftWorks Parent, LLC (3345); CraftWorks Restaurants & Breweries Group, Inc. (4820); CraftWorks Restaurants & Breweries, Inc. (2504); CraftWorks Restaurants & Breweries, LLC (0676); GB Acquisition, Inc. (5175); GB Franchise, LLC (7716); GB Kansas, LLC (0924); GB Maryland, Inc. (6439); GB Parent, Inc. (1281); GBBR Texas, Inc. (9904); Gordon Biersch Brewery Restaurant Group, Inc. (8023); Harbor East Brewery, LLC (7759); Logan's Restaurants, Inc. (9987); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Kansas, Inc. (8716); Logan's Roadhouse of Texas, Inc. (2372); LRI Holdings, Inc. (4571); Old Chicago Franchising LLC (7249); Old Chicago of Colorado, Inc. (4857); Old Chicago of Kansas, Inc. (0606); Old Chicago Oregon, LLC (5083); Old Chicago Parker Crossing, Inc. (9218); Old Chicago Taproom, LLC (5838); Old Chicago Westminster, Inc. (5759); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); Rock Bottom Arizona, Inc. (4848); Rock Bottom License, LLC (9033); Rock Bottom of Minneapolis, Inc. (5762); Wadsworth Old Chicago, Inc. (4849); Walnut Brewery, Inc. (7405). The Debtors' mailing address is 3011 Armory Drive, Suite 300, Nashville, TN 37204.

[2]  Capitalized terms used but not defined herein shall have the meaning given to them in the DIP Credit Agreement (as defined below) or the Proposed Interim Order, as applicable.

## **RELIEF REQUESTED**

1.      By this Motion, and pursuant to sections 105(a), 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-1 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** (the "Proposed Interim Order"), and a final order (the "Proposed Final Order" and, together with the Proposed Interim Order, the "DIP Orders"),[3] (i) authorizing the Debtors to obtain postpetition debtor in possession financing pursuant to the DIP Credit Agreement (as defined below), a copy of which is attached as **Exhibit 1** to the Proposed Interim Order, on the terms described herein; (ii) granting liens and superpriority administrative claims; (iii) authorizing the use of "cash collateral" (as defined in section 363 of the Bankruptcy Code, "Cash Collateral"); (iv) granting the Adequate Protection Obligations to the Prepetition Secured Parties (each as defined below); (v) scheduling a final hearing (the "Final Hearing") within approximately 28 days of the commencement of these Chapter 11 Cases to consider entry of the Proposed Final Order; and (vi) granting related relief.

2.      In support of this Motion, the Debtors submit (a) the Declaration of Colin M. Adams, Managing Director, M-III Advisory Partners, LP (the "Adams Declaration"), filed contemporaneously herewith, and (b) the First Day Declaration (as defined below).

---

[3]     The Debtors intend to file the Proposed Final Order prior to the Final Hearing (as defined below).

## JURISDICTION AND VENUE

3.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

4.      Pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

## BACKGROUND

### A.      General Background

5.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No trustee, examiner, or statutory committee of creditors has been appointed in the Chapter 11 Cases.

8.      The Debtors are the nation's leading operator and franchisor of steakhouses and brewery and craft beer focused casual dining restaurants in the U.S., with 338 locations in 39

States and the District of Columbia and abroad in Taiwan.[4]  The Debtors employ more than 18,000

team members and corporate and other support staff, including at its restaurants nationwide and at

offices located in Nashville, Tennessee and Broomfield, Colorado.

9.    The Debtors' four largest "core" brands include Logan's Roadhouse, Old

Chicago Pizza & Taproom, Gordon Biersch Brewery Restaurant and Rock Bottom Restaurant and

Brewery.   In addition, the Debtors own and operate unique one-off "specialty" restaurants such

as Big River Grille & Brewing Works and ChopHouse & Brewery.  Finally, the Debtors derive

substantial revenue each year from franchising their core brands Logan's Roadhouse, Old Chicago

and Gordon Biersch.

10.    Additional information regarding the Debtors, including their business

operations, their corporate and capital structure and the events leading to the commencement of

the Chapter 11 Cases is set forth in the *Declaration of Hazem Ouf in Support of Chapter 11*

*Petitions and First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith

and incorporated herein by reference.

**B.    The Debtors' Prepetition Capital Structure**

11.    As of the Petition Date, the Debtors had approximately $235.4 million in

outstanding debt, as described in detail below.  A summary of the debt obligations is as follows:

|  | **Facility** | **Agent/ Lender/ Issuer** | **Borrowers/ Guarantors** | **Secured/ Unsecured** | **Principal Amount Outstanding** |
|---|---|---|---|---|---|
| 1. | First Lien Loans – Term Loan and | Fortress Credit Co LLC, as agent | All Debtors other than CW Parent | Secured | $131.7mm[5] |

---

[4]    Approximately 261 of the Debtors' restaurants are leased and approximately 77 are franchised.

[5]    Represents the total aggregate principal amount owed to Fortress as acknowledged in the Forbearance Agreement; however, Fortress' total claim may exceed this amount by the amount of accrued and unpaid interest (including the $3.2 million interest payment that was not paid on February 3, 2020, fees including the $500,000 forbearance fee, and other fees and expenses required to be paid pursuant to Section 12.3 of the Prepetition Credit Agreement.

| | Facility | Agent/ Lender/ Issuer | Borrowers/ Guarantors | Secured/ Unsecured | Principal Amount Outstanding |
|---|---|---|---|---|---|
| | Revolving Line of Credit | | and CW Intermediate | | |
| 2. | First Lien Loans – Letters of Credit | Wells Fargo Bank, National Association, | All Debtors other than CW Parent and CW Intermediate | Secured | $4.7mm |
| 4. | Second Lien Loans – Term Loan | Wells Fargo Bank, National Association, as agent | All Debtors other than CW Parent and CW Intermediate | Secured | $35.0mm |
| 5. | Seller Notes | Roadhouse Holding Inc. | All Debtors other than CW Parent and CW Intermediate | Unsecured | $30.0mm |
| 6. | Recovery Note | Wells Fargo Bank, National Association | CraftWorks Parent, LLC | Unsecured | $34.0mm[6] |

(1)     The Prepetition First Lien Credit Facility

12.     Prior to the commencement of the Chapter 11 Cases, Debtors CraftWorks Holdings, LLC ("CW Holdings"), Craftworks Restaurants & Breweries, Inc. ("Craftworks Borrower") and Logan's Restaurants, Inc. ("Logan Borrower" and, together with Craftworks Borrower, the "Borrowers") were parties to that certain First Lien Credit Agreement dated as of November 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), by and among CW Holdings, the Borrowers, the financial institutions from time to time party thereto as lenders (the "Prepetition First Lien

---

[6]     The Recovery Note consists of a promissory note of $34 million and is subordinate to the First Lien Term Loan, Second Lien Term Loan and the Seller Note.  The Recovery Note does not bear interest.  The principal amount of the Recovery Note is paid as follows: (1) after equity proceeds of $45 million have been distributed to the Company's equity holders (Initial Equity Distribution), the Company's equity holders will receive no further equity proceeds until the Recovery Note payee receives $18 million (First Principal Payment) and (2) after the Initial Equity Distribution and First Principal Payment and additional equity proceeds of $90 million have been distributed to the equity holders, the shareholders will receive no further equity proceeds until the Recovery Note payee receives $16 million.  For accounting purposes, due to the contingent nature of the liability, the Company recorded a liability for the Recovery Note of $18.3 million.

Lenders"), Fortress Credit Co LLC ("Fortress"), as administrative agent and collateral agent for the Prepetition First Lien Lenders  (in such capacities, the "Prepetition First Lien Agent") and Wells Fargo Bank, National Association ("Wells Fargo"), as issuing lender (in such capacity, the "Issuing Lender;" and collectively with the Prepetition First Lien Lenders and the Prepetition First Lien Agent, the "Prepetition First Lien Secured Parties").

13.     The Prepetition First Lien Credit Agreement provides for a loan commitment comprised of (a) a $130.0 million secured term loan commitment, (b) a $3.0 million revolving credit commitment and (c) a $6.0 million letter of credit commitment.  The Debtors used the proceeds of the loans under the Prepetition First Lien Credit Agreement to fund the Logan's Borrower's acquisition of Logan's Roadhouse (the "Logan's Acquisition") by refinancing, in part, its existing credit facility.  As of the Petition Date, the outstanding principal balance of term loans and revolving loans is $128.7 million and $3.0 million, respectively, and there is approximately $4.7 million in outstanding issued letters of credit.  The Prepetition First Lien Credit Agreement matures on November 1, 2023.

14.     Pursuant to that certain Guaranty and Security Agreement dated as of November 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Guaranty and Security Agreement"), in favor of the Prepetition First Lien Agent, the obligations under the Prepetition First Lien Credit Agreement are guaranteed, jointly and severally, by CW Holdings, the Borrowers and Debtors Big River Breweries, Inc., Brew Moon Colorado, Inc., ChopHouse License, LLC, Craft Brewery Holding, Inc., CraftWorks Restaurants & Breweries Group, Inc., CraftWorks Restaurants & Breweries, LLC, GB Acquisition, Inc., GB Franchise, LLC, GB Kansas, LLC, GB Maryland, Inc., GB Parent, Inc., GBBR Texas, Inc., Gordon Biersch Brewery Restaurant Group, Inc., Harbor East Brewery, LLC,

Logan's Roadhouse Of Kansas, Inc., Logan's Roadhouse of Texas, Inc., Logan's Roadhouse, Inc., LRI Holdings, Inc., Old Chicago Franchising LLC, Old Chicago of Colorado, Inc., Old Chicago of Kansas, Inc., Old Chicago Oregon, LLC, Old Chicago Parker Crossing, Inc., Old Chicago Taproom, LLC, Old Chicago Westminster, Inc., Roadhouse Intermediate Inc., Roadhouse Midco Inc., Roadhouse Parent Inc., Rock Bottom Arizona, Inc., Rock Bottom License, LLC, Rock Bottom of Minneapolis, Inc., Wadsworth Old Chicago, Inc. and Walnut Brewery, Inc. (collectively with CW Holdings and the Borrowers, the "Existing Loan Parties")[7] and are secured by substantially all of the assets of the Existing Loan Parties (collectively, the "Prepetition Collateral").  The Prepetition First Lien Credit Agreement, the Prepetition First Lien Guaranty and Security Agreement, and all other agreements, documents, notes, certificates and instruments executed and/or delivered in connection with, to, or in favor of the Prepetition First Lien Secured Parties, including, without limitation, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates and instruments executed and/or delivered in connection therewith or related thereto, each may have been amended, modified or supplemented from time to time are collectively referred to herein as the "Prepetition First Lien Documents."

15.     On January 31, 2020, CW Holdings, the Borrowers, the Prepetition First Lien Agent and the Prepetition First Lien Lenders entered into a forbearance agreement (the "First Lien Forbearance Agreement"), pursuant to which the Prepetition First Lien Agent and the Prepetition First Lien Lenders agreed to forbear from exercising their rights and remedies under the Prepetition First Lien Documents in respect of certain defaults and events of default thereunder

---

[7]     The following Debtors are not Existing Loan Parties:  CraftWorks Parent, LLC and CraftWorks Intermediate Co, LLC.

through the earliest of (a) February 14, 2020; provided that such date was extended to March 1, 2020 if (i) no Termination Event had then occurred and (ii) the Existing Loan Parties demonstrated reasonable progress in preparing for these Chapter 11 Cases, (b) the filing of these Chapter 11 Cases and (c) the date on which a Termination Event occurs.

(2)     The Prepetition Second Lien Credit Facility

16.     Prior to the commencement of the Chapter 11 Cases, the Borrowers and CW Holdings were parties to that certain Second Lien Credit Agreement dated as of November 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Second Lien Credit Agreement"), by and among CW Holdings, the Borrowers, the financial institutions from time to time party thereto as lenders (the "Prepetition Second Lien Lenders"), and Wells Fargo, as administrative agent and collateral agent for the Prepetition Second Lien Lenders (in such capacities, the "Prepetition Second Lien Agent," and together with the Prepetition Second Lien Lenders, the "Prepetition Second Lien Secured Parties").

17.     The Prepetition Second Lien Credit Agreement provides for a $35.0 million secured term loan facility.  The obligations arising under the Prepetition Second Lien Credit Agreement constitutes take-back debt arising from the Logan's Acquisition.  As of the Petition Date, the outstanding principal balance under the Second Lien Credit Agreement is approximately $35.0 million on account of the second lien term loan.  The Prepetition Second Lien Credit Agreement matures on May 1, 2024.

18.     Pursuant to that certain Prepetition Second Lien Guaranty and Security Agreement dated as of November 1, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Second Lien Guaranty and Security Agreement"), in favor of the Prepetition Second Lien Agent, the obligations under the Prepetition Second Lien

Credit Agreement are guaranteed, jointly and severally, by the Existing Loan Parties and are secured by the Prepetition Collateral.  The Prepetition Second Lien Credit Agreement, the Prepetition Second Lien Guaranty and Security Agreement, and all other agreements, documents, notes, certificates and instruments executed and/or delivered in connection with, to, or in favor of the Prepetition Second Lien Agent and/or Prepetition Second Lien Lenders, including, without limitation, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates and instruments executed and/or delivered in connection therewith or related thereto, each may have been amended, modified or supplemented from time to time are collectively referred to herein as the "Prepetition Second Lien Documents."

19.     The Prepetition First Lien Documents and the Prepetition Second Lien Documents are together referred to herein as the "Prepetition Secured Loan Documents."  The Prepetition First Lien Agent and the Prepetition Second Lien Agent are together referred to herein as the "Prepetition Agents."  The Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties are together referred to herein as the "Prepetition Secured Parties," and each, a "Prepetition Secured Party."

(3)     The P-Card Program

20.     The Debtors provide certain employees with access to purchase cards (collectively, the "P-Cards") issued by Wells Fargo (the "P-Card Program") pursuant to that certain WellsOne® Commercial Card Agreement, dated on or around October 27, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "P-Card Agreement"), by and between the Debtors and Wells Fargo.  Prior to the Petition Date, the Debtors had largely phased out the P-Card Program.  As a result, as of the Petition Date, the P-Cards only

remain in use by a handful of employees for approved business expenses and supplies incurred by employees on behalf of the Debtors in the ordinary course of business. Costs incurred through use of the P-Cards, in turn, are paid on a monthly basis. Pursuant to that certain Security Agreement: Card Obligations dated on or about February 20, 2020, obligations under the P-Card Program (the "P-Card Obligation") are secured by funds deposited by the Debtors into the deposit account (ending 1298) maintained by the Debtors at Wells Fargo (the "P-Card Carve-Out Collateral").

(4)     Intercreditor Agreement[8]

21.     Pursuant to that certain Intercreditor Agreement dated as of November 1, 2019, by and among (a) Fortress, as First Lien Representative for the Initial First Lien Claimholders, Fortress, as collateral agent for the Initial First Lien Claimholders, (b) Wells Fargo, as Second Lien Representative for the Initial Second Lien Claimholders, (c) Wells Fargo, as collateral agent for the Initial Second Lien Claimholders, and (d) each additional First Lien Representative, First Lien Collateral Agent, Second Lien Representative and Second Lien Collateral Agent from time to time party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), the First Lien Representative, First Lien Collateral Agent, Second Lien Representative and Second Lien Collateral Agent agreed, among other things and as more specifically set forth therein, on the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral. The Intercreditor Agreement provides, among other things, that the liens securing obligations under the Prepetition Second Lien Documents (the "Prepetition 2L Liens") are

---

[8]     All capitalized terms used but not otherwise defined in this subsection shall have the meanings ascribed to such terms in the Intercreditor Agreement.

subordinate and junior to the liens securing obligations under the Prepetition First Lien Documents (the "Prepetition 1L Liens," and together with the Prepetition 2L Liens, the "Prepetition Liens").

(5)    The Seller Note

22.    In connection with Logan Borrower's acquisition of Roadhouse Intermediate, Inc., LRI executed that certain Subordinated Promissory Note dated as of November 1, 2018 (the "Initial Seller Note") in the original principal amount of $30,000,000 in favor of Roadhouse Holding Inc. ("Roadhouse Holding"). The Initial Seller Note incurs interest at a rate per annum equal to (a) 0.0% for the period beginning on November 1, 2018 through November 1, 2019, (b) 12.0% for the period beginning November 2, 2019 through November 1, 2020, (c) 14.0% for the period beginning November 2, 2020 through November 1, 2021 and (d) 16.0% for the period beginning November 2, 2021 and thereafter. Interest is payable annually on the anniversary of the Initial Seller Note. The Initial Seller Note matures on November 1, 2024.

23.    The Initial Seller Note was subsequently assigned by Roadhouse Holding to various permitted lenders, and in connection therewith, LRI executed a series of six (6) unsecured subordinated promissory notes dated October 31, 2019, referred to as the "1L PIK Notes," and a series of nine (9) unsecured subordinated promissory notes dated October 31, 2019, referred to as the "2L PIK Notes."

24.    As of the Petition Date, the aggregate outstanding principal balance of the 1L PIK Notes and 2L PIK Notes is $30.0 million.

(6)    The Recovery Note

25.    Pursuant to that certain Recovery Note Purchase and Assignment Agreement dated as of November 1, 2018 (the "Recovery Note Agreement"), by and among CW Parent, Debtor CraftWorks Restaurants & Breweries Group, Inc. ("CW Restaurants & Breweries

Group") and Wells Fargo, as administrative agent for certain lenders (collectively, the "Payee"), CW Parent issued and sold to CW Restaurants & Breweries Group that certain Recovery Payment Note dated November 1, 2018 (the "Original Recovery Note") in the original principal amount of $34,000,000 by CW Parent in favor of CW Restaurants & Breweries Group.

26.     Following issuance and purchase of the Original Recovery Note by CW Restaurants & Breweries Group, the Original Recovery Note was assigned by CW Restaurants & Breweries Group to the Payee pursuant to that certain Recovery Note dated as of November 1, 2018 in the original principal amount of $34,000,000 (the "Amended Recovery Note") by CW Parent in favor of the Payee.  The Amended Recovery Note is unsecured, accrues no interest and is payable in accordance with the payment waterfall described therein.

27.     As of the Petition Date, the outstanding principal amount of the Amended Recovery Note is approximately $34.0 million.

## C.    The Debtors Have a Critical Need for Post-Petition Financing

28.     The Debtors have insufficient cash to operate their business and continue paying their debts as they come due.  The Debtors require immediate access to liquidity to ensure that they can continue operating in these Chapter 11 Cases while they conduct a sale and marketing process for their assets.  Without prompt postpetition financing and access to Cash Collateral, the Debtors do not have sufficient cash to operate their business, pay employee wages, or pay other critical business expenses, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

29.     Prior to the Petition Date, the Debtors, in consultation with their financial advisor, M-III Advisory Partners, L.P. ("M-III"), reviewed and analyzed the Debtors' projected cash needs and prepared a 13-week cashflow projection outlining the Debtors' postpetition cash needs.  A copy of the initial budget is attached the Proposed Interim Order as **Exhibit 2** (the "DIP

Budget"). The Debtors believe that the DIP Budget and their projections provide an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligation and are reasonable and appropriate under the circumstances.

30. Based on the forecasts set forth in the DIP Budget, the Debtors, with the assistance of their advisors, determined the amount of postpetition financing required to administer these Chapter 11 Cases, including (a) to fund the first twenty-one (21) days of these Chapter 11 Cases (which is estimated to be $12 million (the "Interim Amount")) and (b) through the closing of the sales process (which is estimated to be $23 million, inclusive of the Interim Amount).

**D.    The Debtors' Efforts to Obtain DIP Financing**

31. In connection with their preparation of the DIP Budget, the Debtors, with the assistance of their advisors, considered potential sources of financing that would provide the liquidity necessary to fund these Chapter 11 Cases. As part of this process, M-III solicited proposals for debtor in possession financing by contacting various well-established and experienced financial institutions and other capital sources. Among others, M-III contacted the Prepetition First Lien Lenders and five other capital sources to solicit financing proposals. As set forth in the Adams Declaration, the five parties were lenders that M-III knew often made loans in distressed and bankruptcy situations and include traditional lender sources and alternative credit funds.

32. Only the Prepetition First Lien Lenders made a financing proposal. No other party M-III contacted expressed interest in providing postpetition credit on an unsecured or subordinated basis given the existence of preexisting secured parties with liens on all of the Debtors' assets. Because substantially all of the Debtors' assets are encumbered by the Prepetition Liens, either the Prepetition Secured Parties would need to consent to priming financing from a

new party or the Debtors would have to prevail on a protracted, expensive and uncertain priming litigation.

33.    The Prepetition First Lien Agent advised the Debtors and M-III that the Prepetition First Lien Lenders would not consent to having their liens primed by any third party postpetition financing facility.

34.    Therefore, to gain access to critical and necessary postpetition financing in the form of the DIP Facility, the Debtors focused their postpetition financing negotiations on the Prepetition First Lien Agent.  These negotiations were conducted at arm's length and in good faith by M-III and the Debtors.

## D.    Detailed Summary of the Proposed DIP Facility

35.    A summary of the proposed DIP Facility and certain material terms set forth in the DIP Credit Agreement is set forth below:[9]

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| **Borrowers** | Craftworks Restaurants & Breweries, Inc. and Logan's Restaurants, Inc. (together, the "DIP Borrower").<br><br>*See* DIP Credit Agreement pmbl. (definition of Borrowers). |
| **Guarantors** | Holdings and each of the DIP Borrowers' existing and future direct and indirect subsidiaries, on a joint and several basis (other than Logan's Roadhouse of Conway, Inc., an Arkansas non-profit corporation).<br><br>*See* DIP Credit Agreement § 1.1 (definition of Guarantors). |
| **DIP Agent** | Fortress Credit Co LLC (in such capacity, together with its successors and assigns, the "DIP Agent").<br><br>*See* DIP Credit Agreement § 1.1 (definition of Administrative Agent). |
| **DIP Lenders** | Certain Prepetition First Lien Lenders will, either directly or through one or more affiliates (or funds or accounts advised or sub-advised by such person) (such participating funds, collectively, the "DIP Lenders") finance the New Money DIP Facility (as defined below) and participate in the New Money DIP Commitments (as defined herein) on a pro rata basis, determined based on the outstanding principal amount of Loans under the Prepetition First Lien Credit Agreement |

---

[9]    This summary is provided in accordance with Bankruptcy Rule 4001 and Local Rule 4001-2 and is qualified in its entirety by reference to the provisions of the DIP Credit Agreement and the Proposed Interim Order.

| **OVERVIEW OF THE DIP FACILITY** | |
|---|---|
| | (together with all other Obligations, the "Prepetition First Lien Obligations") held by the DIP Lenders as of the date of the Petition Date.<br><br>*See* DIP Credit Agreement § 1.1 (definition of Lender). |
| **DIP Facility** | A secured superpriority priming debtor-in-possession non-amortizing facility comprised of:<br><br>(i)    a new money credit facility in an aggregate principal amount not to exceed $23 million (the "New Money DIP Facility"; the DIP Lenders' commitments under the New Money DIP Facility, the "New Money DIP Commitments"; the loans under the New Money DIP Facility, the "New Money DIP Loans"; each DIP Lender's claim under the New Money DIP Facility, a "New Money DIP Claim"; and collectively, the "New Money DIP Claims"; and proceeds received by the Borrowers from the New Money DIP Loans (as defined below), the "DIP Proceeds");<br><br>(ii)    a roll up loan facility (the "Roll-Up DIP Facility"; the applicable DIP Lenders' commitments under the Roll-Up DIP Facility, the "Roll-Up DIP Commitments") pursuant to which the DIP Lenders shall be deemed to make loans under the Roll-Up DIP Facility (the deemed loans under the Roll-Up DIP Facility, the "Roll-Up DIP Loans"; each DIP Lender's claim under the Roll-Up DIP Facility, a "Roll-Up DIP Claim"; and collectively, the "Roll-Up DIP Claims") in an amount equal to five dollars for every dollar of New Money DIP Loans disbursed by such DIP Lenders (or their designated affiliates) from and after the entry of the Interim Order and upon any Extension of Credit (as defined in the DIP Credit Agreement) occurring thereafter (with the aggregate principal amount of all Roll-Up DIP Loans of all DIP Lenders shall not exceed $115,000,000 at any time); and<br><br>*See* Proposed Interim Order pmbl.; DIP Credit Agreement §§ 2.1, 3.1. |
| **DIP Budget** | The "DIP Budget" shall consist of a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period (and draws under the DIP Facility), which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases (including professional fees), and working capital and other general corporate needs, which forecast shall be in form reasonably satisfactory to the DIP Agent at the direction of the Required DIP Lenders and in substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders.<br><br>*See* DIP Credit Agreement § 1.1 (definition of Budget). |
| **Interest Rate** | The New Money DIP Loans will bear interest at the Applicable Margin (as defined herein) *plus* the current LIBOR rate as determined by the DIP Agent in accordance with its customary procedures, and utilizing such electronic or other quotation |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | sources as it considers appropriate, to be the rate at which United States Dollar deposits are offered to major banks in the London interbank market three (3) Business Days prior to the commencement of the requested interest period, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one month (the "LIBOR Rate"), payable quarterly in arrears; provided, however, that in no event shall the LIBOR Rate at any time be less than 1.00%.<br><br>"Applicable Margin" means a rate per annum equal to 8.5% paid in cash.<br><br>The Roll-Up DIP Loans will bear interest at the non-default rate set forth in the Prepetition First Lien Loan Documents, payable in cash on the DIP Termination Date.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.<br><br>Default Rate: upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Documents, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 2.00% *per annum*.<br><br>*See* DIP Credit Agreement § 5.1. |
| **Fees** | A closing fee equal to 2.00% (the "Closing Fee") on the entire New Money DIP Commitments, which shall be earned upon entry of the Interim DIP Order, with such Closing Fee to be shared on a pro rata basis by the DIP Lenders.  The Closing Fee shall be paid in cash on the Closing Date to the DIP Agent (for distribution to the DIP Lenders).<br><br>*See* DIP Credit Agreement § 5.3. |
| **Use of Proceeds** | To provide working capital, for general corporate purposes and to fund the Chapter 11 Cases, in each case subject to the DIP Budget (including Permitted Variances) and the terms and conditions of the DIP Credit Agreement and the DIP Orders, including, without limitation, to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses) and the section 363 sale process, and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility.<br><br>*See* Proposed Interim Order ¶ 9; DIP Credit Agreement § 8.6. |
| **Use of Cash Collateral; Entities with an Interest in Cash Collateral** | The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in the Interim Order, the DIP Budget (and Permitted Variances) and the DIP Loan Documents.<br><br>"Cash Collateral" means all cash proceeds of the Prepetition Collateral, including all such cash proceeds held in any of the Existing Loan Parties' banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts or funds held in the Excluded Accounts), |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | wherever located, are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. |
| | The entities with an interest in Cash Collateral are the DIP Agent, DIP Lenders and the Prepetition Secured Parties. |
| | *See* Proposed Interim Order ¶ 10. |
| **Conditions to Borrowing** | Certain customary conditions precedent to extensions of credit, including, among other things, (i) execution of DIP Loan Documents, (ii) entry of the DIP Orders, (iii) representations and warranties of each Borrower and each Guarantor set forth in the DIP Credit Agreement shall be true and correct in all material respects (without duplication of any materiality qualifier) on and as of the Closing Date or on and as of the date of any Extension of Credit thereafter, (iv) receipt of a notice at least two business days prior to the anticipated date of any Extension of Credit, (v) compliance with the DIP Budget (subject to Permitted Variances), (vi) limitations on material indebtedness, (vii) no Material Adverse Effect, and (viii) no Default or Event of Default shall have occurred or be existing. |
| | *See* DIP Credit Agreement §§ 6.1, 6.2. |
| **DIP Collateral** | "DIP Collateral" means all prepetition and postpetition property of the Debtors, wherever located, whether existing on the Petition Date or thereafter acquired. |
| | *See* Proposed Interim Order ¶ 5. |
| **Liens and Priorities of DIP Obligations** | All obligations of the Borrowers and the Guarantors to the DIP Agent and the DIP Lenders under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due, or any exposure of each DIP Lender and its affiliates in respect of cash management incurred on behalf of the Borrowers or any Guarantor under the DIP Facility (collectively, the "DIP Obligations"), shall be secured by liens and security interests (the "DIP Liens") on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of, with respect to the DIP Obligations, each of the DIP Parties (the "DIP Collateral"), including without limitation:  (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, and proceeds of the foregoing, wherever located, including insurance or other proceeds, (b) all owned real property interests and all leasehold real property interests and proceeds thereof, (c) subject to, and upon entry of, the Final Order, any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code ("Avoidance Actions") and |

| **OVERVIEW OF THE DIP FACILITY** | |
|---|---|
| | the proceeds thereof, and (d) all other property of the DIP Parties that was not otherwise subject to valid, perfected, enforceable and nonavoidable liens on the Petition Date.  Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) any assets held by the Debtors in trust, and any "Excluded Assets" (as defined in the DIP Credit Agreement).<br><br>The DIP Liens securing the DIP Obligations are valid, automatically fully-perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out and shall otherwise be junior only to Permitted Prior Liens.  Other than as set forth in this Interim Order or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code, other than in respect of any Prepetition First Lien Obligations that have been satisfied and replaced by Roll-Up DIP Loans (subject only to the Challenge Deadline and related provisions set forth in paragraph 38).  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.<br><br>*See* Proposed Interim Order ¶¶ 5, 6. |
| **Carve-Out** | "Carve Out" means an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (without regard to the notice set forth in clause (iii) below); and (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, final order or otherwise, all budgeted and accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all budgeted and accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Agent at the direction of the Required DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) (a) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the DIP Agent at the direction of the Required DIP Lenders of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, final order, |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | or otherwise plus (b) solely for the benefit of Configure Partners, LLC ("Configure Partners"), an amount equal to any M&A Transaction Fee allowed by the Bankruptcy Court and payable to Configure Partners, pursuant to, and consistent with, Configure Partners' engagement letter with the Borrowers, as a result of the closing of any M&A Transaction consented to by the DIP Agent and the Required DIP Lenders (together with sub-clause (a) of this clause (iv), the "Post-Carve Out Trigger Notice Cap"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Agent at the direction of the Required DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked. <br><br>For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the adequate protection liens and claims, and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations. <br><br>*See* Proposed Interim Order ¶ 35. |
| **Adequate Protection to Prepetition Secured Parties** | As adequate protection for the use of the collateral securing the Prepetition Obligations (the "Prepetition Collateral"), the Prepetition Agents, on behalf of and for the benefit of the Prepetition Lenders, and the Prepetition Lenders, shall receive, in each case subject to the Carve Out: <br><br>(i)     solely with respect to the Prepetition First Lien Agent and Prepetition First Lien Lenders, payment of all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of the Prepetition First Lien Agent (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the Prepetition First Lien Agent's outside restructuring counsel, King & Spalding LLP ("K&S") and the Prepetition First Lien Agent's outside finance and acquisition counsel, Hunton Andrews Kurth LLP ("Hunton"), and any successor counsel, and, to the extent necessary, one firm of local counsel engaged by the Prepetition First Lien Agent in connection with the Chapter 11 Cases); <br><br>(ii)     pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Credit Parties hereby grant to (x) the Prepetition First Lien Agent, on behalf of itself and the Prepetition First Lien Parties and (y) the Prepetition Second Lien Agent, on behalf of itself and the Prepetition Second Lien Parties, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | Collateral (the "Adequate Protection Liens"); |
| | (iii)   to the extent of any Diminution in Value (if any) of their respective interests in the Prepetition Collateral, and subject in all respects to the Carve Out, (x) the Prepetition First Lien Agent, on behalf of itself and the Prepetition First Lien Parties and (y) the Prepetition Second Lien Agent, on behalf of itself and the Prepetition Second Lien Parties, are each hereby granted as and to the extent provided by section 507(b) or the Bankruptcy Code allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (the "Adequate Protection Superpriority Claims"); and |
| | (iv)   reasonable access to the Debtors' books and records and such financial reports as are provided to the DIP Agent. |
| | *See* Proposed Interim Order ¶¶ 11, 13, 15, 43. |
| **Financial, Reporting and Other Covenants** | Articles VIII and IX of the DIP Credit Agreement contains covenants customary and appropriate for DIP financings of this type, including, but not limited to, (i) provision of and compliance with the DIP Budget, (ii) reporting of financial information, (iii) operation and maintenance of properties, and (iv) maintenance of insurance on properties.<br><br>*See* DIP Credit Agreement art. VIII, IX. |
| **Milestones** | The DIP Credit Agreement will include the following milestones (the "Case Milestones") related to the Debtors' Chapter 11 Cases:<br><br>• No later than three calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.<br><br>• No later than twenty-eight (28) calendar days after the Petition Date the Debtors shall have filed their Schedules and Statement of Financial Affairs with the Bankruptcy Court.<br><br>• No later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order setting the date (the "Bar Date") by which proofs of claim for general unsecured creditors must be filed.<br><br>• No later than thirty (30) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.<br><br>• No later than sixty-five (65) calendar days following the Petition Date, the Bar Date shall have occurred.<br><br>The DIP Credit Agreement will include the following sale milestones (the "Sale Milestones"; together with the Case Milestones, the "Milestones") related to the Debtors' 363 Sale (as defined herein):<br><br>• By no later than the entry of the Interim DIP Order, the Debtors shall have entered into a stalking horse purchase agreement (the "Staking Horse Agreement") (in form and substance acceptable to the Required DIP Lenders) with the DIP Agent (the "Stalking Horse Bidder") for all or substantially all of the Debtors' assets, stores and employees (subject to the Stalking Horse Bidder's ability to remove assets (including stores and |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | employees) consistent with the Stalking Horse Agreement) (the "Stalking Horse Assets" and, the Stalking Horse Bidder's bid for such Stalking Horse Assets, the "Stalking Horse Bid"), and such Stalking Horse Agreement shall consist of a credit bid of the DIP Obligations and/or the Prepetition First Lien Obligations for the Stalking Horse Assets. |
| | • No later than seven (7) calendar days following the Petition Date, the Debtors shall file a motion (the "Sale Motion"), in form and substance acceptable to the DIP Agent and the Required DIP Lenders, requesting (x) an order from the Bankruptcy Court (the "Bid Procedures Order") (i) approving the proposed bid procedures attached to the Sale Motion related to the sale of the Stalking Horse Assets (the "Bid Procedures"), and (ii) authorizing the Debtors to provide the Stalking Horse Bidder with the bid protections set forth in the Stalking Horse Agreement, and (y) an order from the Bankruptcy Court (the "Sale Order") approving the sale of the Stalking Horse Assets to the Stalking Horse Bidder or such other higher or better bidder determined in accordance with the Bid Procedures. |
| | • No later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order, in form and substance reasonably satisfactory to the DIP Agent and the Required DIP Lenders. |
| | • No later than seventy-five (75) calendar days after the Petition Date, the Debtors shall complete an auction for substantially all of its assets, including the Stalking Horse Assets, in accordance with the Bid Procedures; provided that if there is no higher or better offer submitted in comparison to the Stalking Horse Bid, no auction shall be held. The Debtors shall declare a "winning bidder" and a "back-up bidder" for its assets in consultation with the DIP Agent and Required DIP Lenders (provided, that, so long as the DIP Agent is a bidder, such consultation right shall not be in effect).  The terms of each "winning bid" and "back-up" bid shall be acceptable to the DIP Agent and the Required DIP Lenders and shall, among other things, provide for proceeds from the sale(s) in a minimum amount satisfactory to the DIP Agent and Required DIP Lenders. |
| | • No later than eighty (80) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order(s) approving the winning bid(s) resulting from the auction. |
| | • No later than ninety (90) calendar days after the Petition Date, the Debtors shall have consummated the sale(s) of its assets to the winning bidder(s) at the auction. |
| | *See* DIP Credit Agreement § 8.21. |
| **Maturity Date** | All DIP Obligations (as defined herein) will be due and payable in full in cash unless otherwise agreed to by the DIP Lenders on the earliest of the date which is the earliest of (a) July 1, 2020, (b) April 2, 2020, if the Final DIP Order Entry Date shall not have occurred as of such date, (c) the date on which the Credit Parties consummate any sale of all or substantially all of the assets of the Credit |

| **OVERVIEW OF THE DIP FACILITY** | |
|---|---|
| | Parties pursuant to Section 363 of the Bankruptcy Code or otherwise, (d) the date on which the Commitments are terminated and the Loans are accelerated, (e) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of a Reorganization Plan of the Credit Parties, (f) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code and (g) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases<br><br>*See* DIP Credit Agreement § 5.5. |
| **Events of Default** | The DIP Credit Agreement contains customary events of default for commercial lending documents, including, without limitation, customary events of default related to: non-payment of obligations; breaches of warranties; non-compliance with covenants and obligations; failure to satisfy or stay execution of judgments in excess of specified amounts; certain actions under ERISA; invalidity of DIP Loan Documents; Change of Control, as well as events of defaults relating the Chapter 11 Cases.<br><br>*See* DIP Credit Agreement § 10.1. |
| **Exercise of Remedies** | The DIP Agent and the DIP Lenders shall have customary remedies, including, without limitation, the following:<br><br>Without further order from the Bankruptcy Court, and subject to the terms of the DIP Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loans under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right in clauses (a) or (f) of this paragraph, the DIP Agent shall be required to provide three (3) business days written notice to the Debtors, the U.S. Trustee, and the Committee of the DIP Agent's intent to exercise its rights and remedies; provided, further, that neither the Debtors, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the DIP Orders and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | expressly set forth in the applicable DIP Loan Documents. The Debtors shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.<br><br>*See* Proposed Interim Order ¶ 30; DIP Credit Agreement § 10.2. |
| **Indemnification** | The Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Lender and each of their affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.<br><br>*See* Proposed Interim Order ¶ 33; DIP Credit Agreement § 12.3. |
| **Debtors' Stipulations and Investigation Period** | Paragraph F of the Interim Order has certain Debtors' Stipulations regarding the extent, validity, enforceability and perfection of the Prepetition Liens and Secured Prepetition Obligations, as well as the absence of any claims against the Prepetition Secured Parties and their respective shareholders, affiliates, partners, members, officers, directors, employees, financial advisors, attorneys, agents and other representatives, with respect to Prepetition Secured Loan Documents. |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | The Debtors' stipulations are subject to the right of parties to assert a Challenge (as defined below). The Committee (to the extent one is appointed) shall have a maximum of sixty (60) calendar days from the date of its appointment and, to the extent a Committee is not appointed, any party in interest (other than the Debtors) shall have a maximum of seventy-five (75) calendar days from entry of the Interim DIP Order (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Debtors' stipulations, or any other stipulations contained in the DIP Orders, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the Prepetition Loan Documents, or to assert any claim or cause of action against the Prepetition Secured Parties arising under or in connection with the Prepetition Loan Documents or the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Obligations, or otherwise. |
| | Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim DIP Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any Chapter 7 Trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed and the Prepetition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations. |
| | *See* Proposed Interim Order ¶ 38. |
| **Sections 506(c) and 552(b) Waivers** | Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders, upon the DIP Collateral, or the Prepetition Collateral and (ii) the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral. |

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| | *See* Proposed Interim Order ¶¶ 40, 42. |
| **Marshalling** | Effective upon entry of the Final DIP Order, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral, the Prepetition Collateral, as applicable, and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary. |
| | *See* Proposed Interim Order ¶ 41. |

## LOCAL RULE 4001-2 DISCLOSURES

36.    The Debtors believe that the following financing terms are required to be highlighted pursuant to Local Rule 4001-2 and, as discussed herein, are necessary and justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

- **Waiver of Section 506(c) Surcharge**.  Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  Although the DIP Loan Documents provide for a waiver of rights under section 506(c) with respect to the Prepetition Secured Parties, the proposed waiver of the estates' rights will be effective only upon entry of the Final Order.  *See* Proposed Interim Order ¶ 40.

- **Liens on Avoidance Actions**.  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.  Upon entry of the Final Order, the DIP Collateral, to which the DIP Liens and Adequate Protection Liens have recourse, shall include causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof.  *See* Proposed Interim Order ¶ 5.

- **Roll-up of Prepetition Obligations**.  Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans from a party to repay its own prepetition debt.  Pursuant to the Roll-Up DIP Facility, the DIP Lenders shall be deemed to make loans under the Roll-Up Facility in an amount equal to five dollars for every dollar of New Money DIP Loans disbursed by DIP Lenders from and after entry of the Interim Order and upon any Extension of Credit occurring thereafter.  *See* Proposed Interim Order preamble.

- **Treatment of Professionals**.  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors.  The DIP Budget includes line items for the Debtors' professionals and Committee's professionals; provided, however, than no more than $50,000 in the aggregate

of the DIP Collateral, the Carve Out, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by the Committee, if any, to investigate claims and/or liens of the Prepetition Secured Parties.  The Carve-Out permits payments to professionals in accordance with the DIP Budget, provided that upon the delivery of a Carve-Out Trigger Notice, professional fees (other than success and transaction fees) are subject to the Post-Carve Out Trigger Notice Cap of $250,000, which is available on an unallocated basis to the Debtors' professionals and the Committee's professionals (in all cases, subject to the DIP Budget).  *See* Proposed Interim Order ¶¶ 35, 37.

- **Priming Liens**.  Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder.  The DIP Liens will prime the existing liens of the Prepetition Secured Parties.  *See* Proposed Interim Order ¶ H.  As discussed above, the Prepetition Secured Parties consented to the priming of their existing liens by the DIP Liens.

- **Equities of the Case**.  Local Rule 4001-2(a)(1)(H) requires disclosure of provisions that seek to affect the Court's power to consider the equities of the case under Section 552(b)(1) of the Bankruptcy Code.  The Interim Order provides that, upon entry of the Final Order, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.   *See* Proposed Interim Order ¶ 42.

37.     The provisions of the DIP Credit Agreement as to which disclosure was required pursuant to Local Rule 4001-2 are all justified under the circumstances of the Chapter 11 Cases because the DIP Lenders would not agree to the DIP Facility and the Prepetition Secured Parties would not agree to the use of Cash Collateral or the priming of their liens by the DIP Lenders without the inclusion of such terms.  As demonstrated below, the DIP Facility is needed to allow the Debtors to operate in chapter 11, and it presents the only financing available to the Debtors at this stage.  Thus, the Debtors submit that the inclusion of these highlighted provisions in the Proposed Interim Order are appropriate under the facts and circumstances and are necessary to prevent immediate and irreparable harm.

**BASIS FOR RELIEF**

**A.     The Debtors Should Be Authorized to Obtain Postpetition Financing Under Section 364(c) of the Bankruptcy Code**

38.     Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re LA Dodgers* LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); *see also In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (stating that debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a).    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(b).    the credit transaction is necessary to preserve the assets of the estate; and

(c).    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

39.     The Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1)–(3) and 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies the three-part test to obtain such financing.

(1)    The Debtors Could Not Obtain Unsecured Financing

40.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe*, 789 F.2d at 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

41.    As set forth above and in the Adams Declaration, unsecured postpetition financing was simply not available to the Debtors.  This is unsurprising given, among other things, the substantial level of secured debt the Debtors already have and the competitive pressures the Debtors are facing in their industry.  Accordingly, the Debtors have satisfied the requirement of

section 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was
unavailable to the Debtors.

> (2)    Entry Into the DIP Facility is Necessary to Preserve and Maximize Assets
> of the Estates and is in the Best Interests of Creditors

42.    A debtor's decision to enter into a postpetition lending facility under section 364 of
the Bankruptcy Code is governed by the business judgment standard.  *See In re Barbara K Enters.,
Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. Mar. 5, 2009) (explaining that courts defer to a
debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions
under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).  Courts
grant a debtor considerable deference in acting in accordance with its sound business judgment.
Indeed, bankruptcy courts generally will not second-guess a debtor's business decisions when
those decisions involve "a business judgment made in good faith, upon a reasonable basis, and
within the scope of [its] authority under the [Bankruptcy] Code."  *In re Curlew Valley Assocs.*, 14
B.R. 506, 513-514 (Bankr. D. Utah.  Oct 8, 1981) (noting that courts should not second guess a
debtor's business decision when that decision involves "a business judgment made in good faith,
upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy]
Code").  Further, to determine whether the business judgment standard is met, a court is "required
to examine whether a reasonable business person would make a similar decision under similar
circumstances."  *See, e.g., Barbara K Enters.*, 2008 WL 2439649 at *14 (explaining that courts
defer to a debtor's business judgment "so long as a request for financing does not 'leverage the
bankruptcy process' and unfairly cede control of the reorganization to any party in interest").

43.    The Debtors' decision to enter into the DIP Facility is an exercise of their
sound judgment that should be approved by the Court.  The Debtors do not have adequate liquidity
to fund their go-forward operations.  The Debtors' management, board and professionals have

reviewed their restructuring alternatives in detail over the past several months and have explored alternative sources of capital and financing.  None of those efforts yielded a result that would allow the Debtors to continue to operate outside of chapter 11.  Therefore, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility at arm's length.  The DIP Facility will provide immediate access to capital on terms that, collectively, are the best and most favorable terms available to the Debtors.

44.     Without access to the DIP Facility, the Debtors could experience a liquidity shortfall and would be deprived of the capital necessary to operate their businesses.  The DIP Facility will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course.  The DIP Facility also will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, vendors and service providers.  With the DIP Facility, the Debtors will be in a position to continue operations, thereby preserving the value of their assets for the benefit of all creditors.

(3)     The Terms of the DIP Facility are Fair and Reasonable Under the Circumstances

45.     In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *See In re Farmland*, 294 B.R. at 886–89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364–65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Judged from that perspective, the terms of the DIP Facility are fair and reasonable.

46.     *First and foremost*, the Debtors believe that the DIP Facility, along with the coupled consent to use Cash Collateral, provides them with sufficient liquidity to continue their operations in the near term.  *Second*, the financial terms of the DIP Facility are consistent with market terms for such financing under the current economic environment and the Debtors' recent and projected financial performance.  Additionally, there is no other financing proposal available to the Debtors, let alone a proposal with materially superior economic terms.  After thorough analysis by the Debtors and their advisors, the Debtors have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances, as well as the only option the Debtors believe is available and feasible.

47.     For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases.

**B.     The Court Should Approve a Priming Lien Under Section 364(d) of the Bankruptcy Code**

48.     Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that a court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A)     the trustee is unable to obtain credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

49.     To justify a priming lien, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code and demonstrate adequate protection.  *See In re*

*Snowshoe Co.*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

50.     As demonstrated above, the Debtors believe that the DIP Facility, which provides for DIP Liens that prime the liens of the Prepetition Secured Parties, is the only available source of postpetition financing in these Chapter 11 Cases.  Not only have the Prepetition Secured Parties consented to the priming of their liens (subject to the terms and conditions set forth in the Proposed Interim Order), but the Proposed Interim Order also provides adequate protection as described herein.

51.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  However, the proposed adequate protection need only provide a prepetition secured creditor "with the same level of protection it would have had if there had not been post-petition superpriority financing." *Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citations and internal quotation marks omitted)).  Moreover, the form of a secured creditor's adequate protection package is firmly within the province of a debtor's business judgment.  *See, e.g.*, *Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.)*, 734 F.2d 426, 435 (9th Cir. 1984) ("Consistent with the policies behind sections 361 and 362, the debtor should be permitted maximum flexibility in structuring a proposal for adequate protection."); *In re True Temper Sports, Inc.*, Case No. 09-13446 (PJW), 2010 WL 5093163, at *8

(Bankr. D. Del. Oct. 9, 2010); *In re Atrium Corp.*, Case No. 10-10150 (BLS), 2010 WL 2822131, at *6 (Bankr. D. Del. Mar. 17, 2010).

52.    The Prepetition Secured Parties are adequately protected against any diminution in value of the Prepetition Collateral.  As a condition to obtaining the Prepetition Secured Parties' consent for the Debtors' use of Cash Collateral, the Debtors agreed to provide certain usual and customary forms of adequate protection.  After extensive, good-faith arm's length negotiations, as adequate protection (the "Adequate Protection Obligations") to the Prepetition Agents, on behalf of and for the benefit of the Prepetition Secured Parties, and the Prepetition Secured Parties, shall receive, subject in each case to the Carve-Out, and solely to the extent of any postpetition diminution in value of the Prepetition Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay (any "Diminution in Value") the following:

(a)     (x) with respect to the Prepetition First Lien Lenders, replacement liens on all Unencumbered Property of the Debtors, which liens will be junior to DIP Liens (the "Prepetition First Lien Lender Adequate Protection Liens") and senior to the Prepetition Second Lien Lender Adequate Protection Liens (as defined below) and the Prepetition Liens, and (y) with respect to the Prepetition Second Lien Lenders, replacement liens on all Unencumbered Property of the Debtors, which liens will be junior to the DIP Liens and the Prepetition First Lien Lender Adequate Protection Liens (the "Prepetition Second Lien Lender Adequate Protection Liens" and, together with the Prepetition First Lien Lender Adequate Protection Liens, the "Prepetition Lender Adequate Protection Liens") and senior to the Prepetition Liens;

(b)    (x) with respect to the Prepetition First Lien Lenders, superpriority administrative expense claims to the extent of any postpetition diminution in value of the Prepetition First Lien Lenders' interest in the Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay (the "Prepetition First Lien Lender Superpriority Claims"), which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors, and (y) with respect to the Prepetition Second Lien Lenders, superpriority administrative expense claims to the extent of any postpetition diminution in value of the Prepetition Second Lien Lenders' interest in the Collateral resulting from the use, sale or lease by the Debtors

of such Prepetition Collateral and/or the imposition of the automatic stay (the "<u>Prepetition Second Lien Lender Superpriority Claims</u>" and, together with the Prepetition First Lien Lender Superpriority Claims, the "<u>Prepetition Lender Superpriority Claims</u>"), which claims will be junior to the DIP Obligations and the Prepetition First Lien Lender Superpriority Claims and be payable from and have recourse to all assets and property of the Debtors;

(c)    payment of all budgeted, reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of the Prepetition First Lien Agent (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of K&S (as restructuring counsel), Hunton (as corporate and finance counsel) and any successor counsel, and, to the extent necessary, one firm of local counsel engaged by the Prepetition First Lien Agent in connection with the Chapter 11 Cases); and

(d)    reasonable access to the Debtors' books and records and the following financial reports provided to the DIP Agent (i) monthly operating reports of the Debtors and their subsidiaries, within thirty (30) calendar days of month end, certified by the Debtors' chief financial officer and (ii) quarterly consolidated financial statements of the Debtors and their subsidiaries within forty-five (45) calendar days of fiscal quarter end, certified by the Borrower's chief financial officer.

53.    The Adequate Protection Obligations and the additional funding provided by the DIP Lenders also maintain the Debtors' operations and preserve their going-concern value. *See, e.g., First Sec. Bank & Trust Co. v. Vander Vegt*, 511 B.R. 567, 583-84 (N.D. Iowa 2014) (finding that secured party was adequately protected because value of collateral was likely to increase was not clearly erroneous); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 632 (Bankr. S.D.N.Y. 1992) ("[The creditor] will be adequately protected because the infusion of approximately $600,000.00 in improvements from the borrowed proceeds will enhance the value of the property secured by [the creditor's] mortgage by at least the amount of the borrowed proceeds."); *In re Ledgemere Land Corp.*, 125 B.R. 58, 65 (Bankr. D. Mass. 1991) (holding that bank was adequately protected when value of collateral would be enhanced); *Bank of New England v. BWL, Inc.*, 121 B.R. 413, 418 (D. Me. 1990) (upholding bankruptcy court's determination that

34

increase in the value of collateral was such that secured party was adequately protected); *accord* 3-361 Collier on Bankruptcy P 361.03 ("In some cases, this requirement may be satisfied if the court finds . . . that the proposed use will result in an enhancement of value."). The postpetition financing provided by the DIP Lenders not only protects against Diminution in Value—which would likely result from the Debtors' inability to continue to finance their operations—but also enhances the Debtors' ability to derive value from the Prepetition Collateral by enabling the Debtors to pursue the value maximizing sale process. In contrast, absent such authority, the Debtors' ability to continue operations will be significantly impaired and the value of their assets and the Prepetition Collateral could be destroyed to the detriment of their creditors. Further, the use of any proceeds of the DIP Facility and other cash shall be solely in accordance with the DIP Budget, which provides further assurance that the DIP Facility will not only maintain the value of the Prepetition Collateral, but will augment the collateral base and strengthen the value of the Debtors' business.

54.     Accordingly, the Debtors respectfully submit that the Prepetition Secured Parties have consented to the priming liens and are adequately protected against any Diminution in Value of the Prepetition Collateral pursuant to the Adequate Protection Obligations.

## C.     The Scope of the Carve-Out is Appropriate

55.     The proposed DIP Facility provides that the DIP Obligations and Adequate Protection Obligations are in all cases subject to the Carve Out. Similar carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames Dep't Stores,* 115 B.R. at 40. The DIP Facility does not directly or indirectly restrict the services for which professionals may be paid in these Chapter 11 Cases, and thus does not deprive the Debtors' estates or other parties in interest of possible rights and powers. *See id.* at 38 (observing that courts insist on carve-outs

for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of professional fees of the Debtors and any official committees, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

56.     With respect to professional fees, the Carve Out provides that, prior to delivery of a Carve-Out Trigger Notice, the Carve-Out will encompass all of the Debtors' and Committee's accrued and unpaid professional fees up until that point in time. For the period following the delivery of a Carve-Out Trigger Notice, the Carve-Out sets aside $250,000 for the Debtors' professionals thereafter, given the likelihood that the Debtors' professionals would be necessary to effect any wind down following the delivery of such notice. Because the Carve-Out's treatment of professional fees is commensurate with each professional's anticipated efforts during these Chapter 11 Cases, the Debtors submit that the Carve-Out's treatment of professional fees is appropriate.

57.     In addition, the Carve-Out includes (a) all fees required to be paid and owing to (i) the Clerk of the Court and (ii) the United States Trustee incurred in connection with the Debtors' chapter 11 cases, as determined by agreement between the Debtors and the United States Trustee or by final order of the Court and (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, and does not impair the ability of any party to object to such fees, expenses, reimbursement or compensation. The Debtors submit that these other features of the Carve-Out are also appropriate in these circumstances.

**D.      The "Roll-Up" in the DIP Facility is Appropriate**

36

58.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under Section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).   The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

59.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this jurisdiction have approved similar DIP features, including on the first day of the case, although to be clear, the roll up component of this DIP Facility is conditioned upon and effective only upon entry of the Final Order.  *See, e.g.*, *In re In re Remington Outdoor Company, Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP that included roll-up of approximately $160 million pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all outstanding prepetition revolving obligations pursuant to interim order); *In re Real Industry, Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included roll-up

of approximately $22 million prepetition debt pursuant to interim order); *In re Radioshack Corp.*,

No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP

that included roll-up of approximately $250 million prepetition debt pursuant to interim order); *In*

*re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing

approximately $200 million DIP that included roll-up of approximately $144 million prepetition

debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D.

Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of

approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's*

*Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing

approximately $140 million DIP that included roll-up of approximately $48.6 million prepetition

debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del.

Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of

approximately $110 million prepetition debt pursuant to interim order).

60.    As set forth above, the DIP Credit Agreement and the Proposed Interim Order

provide that subject to and only upon entry of a Final Order, certain Prepetition First Lien

Obligations shall be satisfied and replaced by the Roll-Up DIP Loans in an amount equal

to five dollars for every dollar of New Money DIP Loans disbursed by the DIP Lenders (or their

designated affiliates) from and after the entry of the Proposed Interim Order and upon any

Extension of Credit occurring thereafter (the "Prepetition First Lien Roll-Up").

61.    The Prepetition First Lien Roll-Up is a sound exercise of the Debtors'

business judgment, is a material component of the structure of the DIP Facility and was required by

the DIP Lenders as a condition to their commitment to provide postpetition financing.  The Debtors

were unable to obtain DIP financing on better (or any) terms.  Without access to the DIP Facility,

the Debtors would lack sufficient liquidity to operate their business.  Maintaining the going-concern value of the Debtors until consummation of the proposed sale is of immense benefit to the Debtors' estates and stakeholders.

62.    Ultimately, the DIP Facility provides the Debtors with the best path forward for a peaceful, going-concern transition into chapter 11 and the continuation of its sale process. The Prepetition Lenders are unlikely to continue to lend postpetition without some assurance regarding their prepetition claims.  Absent the Prepetition Secured Parties' support, the first month of the Chapter 11 Cases would likely devolve into a costly priming fight.

63.    Given these circumstances, the Prepetition First Lien Roll-Up, as set forth in the DIP Credit Agreement and the DIP Orders, is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**E.    The Debtors Should be Authorized to Use Cash Collateral.**

64.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section ... 1108... of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" in the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)    each entity that has an interest in such collateral consents; or

> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

65.    During the ordinary course of operations, the Debtors generate cash from the use of the DIP Collateral.  As of the Petition Date, the Debtors held only a *de minimis* amount of cash.  The Debtors need the DIP Facility and the use of Cash Collateral to fund their ordinary course of business operations and administer the Chapter 11 Cases while they pursue an orderly sale process.  The DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral; thus, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion.  Accordingly, to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

66.    The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  The parties with the material interest in the Cash Collateral— namely the Prepetition Secured Parties—consent to the use of Cash Collateral provided that the relief requested herein is granted.  Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

**F.    The Debtors Should Be Authorized to Continue to Use the P-Card Program**

67.    The P-Card Program enables certain of the Debtors' employees to incur certain approved business expenses and supplies on behalf of the Debtors in the ordinary course of business.  The Debtors hereby request authority for (a) the Debtors to continue to use the P-Cards subject the terms of to the P-Card Agreement and (b) Wells to make advances from time to time to the Debtors under the P-Card Program with a maximum exposure at any time up to

40

$75,000.00.  The Debtors further request that (i) Wells Fargo be deemed to have a valid and perfected, non-avoidable first-priority liens in and security interest on the P-Card Carve-Out Collateral (and any proceeds thereof) pursuant to section 364(d)(1) of the Bankruptcy Code with respect to the indebtedness owed by the Debtors to Wells Fargo under the P-Card Program and (ii) such liens and interests shall not be primed by any lien granted to any post-petition lender or other person or by the Carve-Out.

## DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES DUE UNDER THE DIP LOAN DOCUMENTS

68.    As described herein, the Debtors have agreed to pay certain fees to the DIP Lenders (collectively, the "DIP Fees") in exchange for their providing the DIP Facility.  As set forth in the Adams Declaration, the terms of the DIP Loan Documents, including the fees imposed thereunder, constitute the best terms on which the Debtors could obtain the postpetition financing necessary to maintain their ongoing business operations and fund their chapter 11 cases. Moreover, the DIP Fees are customary and usual and in line with DIP Financings of this kind.  The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Loan Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing.  The Debtors believe paying these fees in order to obtain the DIP Financing is in the best interests.

## GOOD FAITH

69.    The terms and conditions of the DIP Facility and the use of Cash Collateral are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of

this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## MODIFICATION OF AUTOMATIC STAY IS WARRANTED

70.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above with respect to the Prepetition Secured Parties, as applicable, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Loan Documents), subject to the "Remedies Notice Period" as set forth in the proposed DIP Orders, for the DIP Agent and/or DIP Lenders to exercise any remedies available to them; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents.  Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.

## REQUEST FOR HEARING AND AUTHORITY TO
## MAKE INTERIM BORROWINGS UNDER THE DIP FACILITY

71.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  *See* FED. R. BANKR. P. 4001(b)(2) and (c)(2).   Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See id.*; *see also* Local Rule 4001-2(b).

72.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the Proposed Interim Order authorizing the Debtors from and

after the entry of the Proposed Interim Order until the Final Hearing to borrow the Interim Amount under the DIP Facility as provided therein.  As set forth herein, this is the minimum amount of relief requested that will provide the Debtors with sufficient liquidity to operate their businesses, administer the Chapter 11 Cases until the Final Hearing and continue their orderly sales process. Absent this relief, the Debtors would be forced to immediately halt the sale process and terminate their operations.  Under these circumstances and in light of the risk of immediate and irreparable harm and prejudice to their estates and all parties in interest, the Debtors submit that interim relief is warranted.

## FINAL HEARING

73.    Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Debtors further respectfully request that this Court set a date for the Final Hearing and authorize it to serve a copy of the signed Proposed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon the Notice Parties (as defined below).

## RESERVATION OF RIGHTS

74.    Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a promise to pay any claim, (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, or (f) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed

as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003(b)

75.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549-50 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

76.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed.  R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

77.     The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the seventy-five (75) largest unsecured claims against the Debtors on a consolidated basis; (c) King & Spalding LLP and Hunton Andrews Kurth LLP, as counsel to the agent under the Debtors' prepetition first lien debt facility and the Debtors' proposed debtor-in-possession financing facility; (d) Morgan, Lewis & Bockius, LLP, as counsel to the agent under the Debtors' prepetition second lien debt facility; (e) all other holders of other debt instruments issued by the Debtors; (f) all parties asserting liens against the Debtors' assets; (g) counsel to equity holders of CW Parent; (h) the state attorneys general for all states in which the Debtors operate; (i) the U.S. Attorney's Office for the District of Delaware; (j) the Internal Revenue Service; and (k) any party that requests service pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m)(iv). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

78.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of page left blank intentionally]*

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Proposed Interim Order and Proposed Final Order and (b) grant such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: March 3, 2020<br>Wilmington, Delaware | */s/ Domenic E. Pacitti* |

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

-and-

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Morton R. Branzburg (*pro hac vice* pending)
1835 Market Street, 14th Floor
Philadelphia, PA 19103
Telephone: (215) 569-2700
Facsimile: (215) 568-6603

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman (*pro hac vice* pending)
Bryan M. Kotliar (*pro hac vice* pending)
575 Madison Avenue
New York, NY 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8876

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Peter A. Siddiqui (*pro hac vice* pending)
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*