## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| **CRAFTWORKS PARENT, LLC,** *et al.*, | : Case No. 20-10475 (___) |
|  | : |
| Debtors.[1] | : Jointly Administered |

### COMBINED MOTIONS OF THE DEBTORS FOR ORDERS:

**(I)(A) APPROVING BID PROCEDURES IN CONNECTION WITH SALE OF THE DEBTORS' ASSETS; (B) SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (C) APPROVING PROCEDURES RELATED TO ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF NOTICES; AND (E) GRANTING RELATED RELIEF; AND**

**(II)(A) AUTHORIZING SALE OF THE DEBTORS' ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

CraftWorks Parent, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Big River Breweries, Inc. (6292); Brew Moon Colorado, Inc. (5001); Chophouse License, LLC (2340); Craft Brewery Holding, Inc. (1228); CraftWorks Holdings, LLC (7163); CraftWorks Intermediate Co, LLC (9810); CraftWorks Parent, LLC (3345); CraftWorks Restaurants & Breweries Group, Inc. (4820); CraftWorks Restaurants & Breweries, Inc. (2504); CraftWorks Restaurants & Breweries, LLC (0676); GB Acquisition, Inc. (5175); GB Franchise, LLC (7716); GB Kansas, LLC (0924); GB Maryland, Inc. (6439); GB Parent, Inc. (1281); GBBR Texas, Inc. (9904); Gordon Biersch Brewery Restaurant Group, Inc. (8023); Harbor East Brewery, LLC (7759); Logan's Restaurants, Inc. (9987); Logan's Roadhouse, Inc. (2074); Logan's Roadhouse of Kansas, Inc. (8716); Logan's Roadhouse of Texas, Inc. (2372); LRI Holdings, Inc. (4571); Old Chicago Franchising LLC (7249); Old Chicago of Colorado, Inc. (4857); Old Chicago of Kansas, Inc. (0606); Old Chicago Oregon, LLC (5083); Old Chicago Parker Crossing, Inc. (9218); Old Chicago Taproom, LLC (5838); Old Chicago Westminster, Inc. (5759); Roadhouse Intermediate Inc. (6159); Roadhouse Midco Inc. (6337); Roadhouse Parent Inc. (5108); Rock Bottom Arizona, Inc. (4848); Rock Bottom License, LLC (9033); Rock Bottom of Minneapolis, Inc. (5762); Wadsworth Old Chicago, Inc. (4849); Walnut Brewery, Inc. (7405). The Debtors' mailing address is 3011 Armory Drive, Suite 300, Nashville, TN 37204.

(the "Chapter 11 Cases"), respectfully represent in support of this motion (the "Motion") as follows:

## RELIEF REQUESTED

1.      By this Motion, and pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors seek entry of two orders.

2.      First, the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"):

(a)     approving procedures (the "Bid Procedures"), the form of which is attached to the Bid Procedures Order as **Exhibit 1**, for (1) submitting bids (each a "Bid") for the purchase of all or substantially all of the Debtors' assets (the "Assets"), and (2) conducting an auction of the Assets (the "Auction"), in the event that the Debtors receive two or more Qualified Bids (as defined in the Bid Procedures) for the Assets;

(b)     authorizing the Debtors, in their discretion, to enter into an asset purchase agreement (as amended from time to time, the "Stalking Horse Agreement"), the form of which is attached to the Bid Procedures Order as **Exhibit 2** with a stalking horse bidder (the "Stalking Horse Bidder");

(c)     scheduling the Auction and hearing (the "Sale Hearing") to consider approval of the sale (the "Sale");

(d)     approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Contracts and Leases");

(e)     approving the form and manner of notices regarding the foregoing; and

(f)     granting related relief.

3.       Upon conclusion of the Sale Hearing, the Debtors request entry of a second order (the "Sale Order")[2]:

    (a)    authorizing the Sale of the Assets to the bidder that is determined to have made the highest or otherwise best Bid (the "Prevailing Bidder") for the Assets in accordance with the Bid Procedures free and clear of all liens, claims, interests, and encumbrances;

    (b)    authorizing the assumption and assignment of certain Contracts and Leases in connection with the Sale; and

    (c)    granting related relief.

4.       In further support of this Motion, the Debtors incorporate and rely upon the First Day Declaration (as defined below) and the *Declaration of Vineet (Vin) Batra in Support of Debtors' Bid and Sale Procedures Motion* (the "Batra Declaration") filed contemporaneously with this Motion, and further respectfully state as follows:

## JURISDICTION AND VENUE

5.       The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

6.       The Debtors consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

---

[2]    The Debtors will file the applicable form or forms of Sale Order as soon as practicable after such document is negotiated and finalized with the applicable purchaser or purchasers.

## BACKGROUND

**A.    General Background**

       7.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Chapter 11 Cases be jointly administered.

       8.      The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

       9.      No trustee, examiner, or statutory committee of creditors has been appointed in the Chapter 11 Cases.

       10.      The Debtors are the nation's leading operator and franchisor of steakhouses and brewery and craft-beer focused casual dining restaurants in the U.S., with 338 locations in 39 States and the District of Columbia and abroad in Taiwan.[3]  The Debtors employ more than 18,000 team members and corporate and other support staff, including at its restaurants nationwide and at offices located in Nashville, Tennessee and Broomfield, Colorado.

       11.      The Debtors' four largest "core" brands are (a) Logan's Roadhouse, (b) Old Chicago Pizza & Taproom ("Old Chicago"), (c) Gordon Biersch Brewery Restaurant ("Gordon Biersch") and (d) Rock Bottom Restaurant and Brewery ("Rock Bottom").  In addition, the Debtors operate unique one-off "specialty" restaurants such as Big River Grille & Brewing Works and ChopHouse & Brewery ("ChopHouse").  The Debtors derive substantial revenue each year from franchising their Logan's Roadhouse, Old Chicago, Gordon Biersch and ChopHouse brands.

---

[3]    Approximately 261 of the Debtors' restaurants are leased and approximately 77 are franchised.

12.     Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Hazem Ouf in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

**B.     The Prepetition Sale Process**

13.     At a time when nearly all restaurants in the U.S. are struggling due to macro- and microeconomic factors, such as rising wages, competition from the fast casual dining industry and online food delivery platforms, the Debtors have managed to continue to drive the profitability of their best performing stores in both their core and specialty brands.  The Debtors have focused on providing their loyal customer base with perfectly crafted experiences in unique and highly differentiated restaurants that are simply not available at many of their competitors.  In connection with this focus on their core customer, the Debtors worked to enhance the quality and selection of food, added new menus, launched an improved guest service platform, and re-aligned their operating management teams to meet and exceed guest expectations.  These factors plus other locally-branded concepts drive high customer satisfaction and repeat business.

14.     As a means to strengthen their business, the Debtors worked with their long-standing real estate advisor of many years, Hilco Real Estate, LLC ("Hilco"), to analyze their lease portfolio and to assist with renegotiating leases and obtaining rent concessions.  After consulting with Hilco and their other advisors, the Debtors closed 37 underperforming and otherwise unprofitable stores in the weeks prior to filing these Chapter 11 Cases in a positive step towards optimizing their footprint.[4]  In addition, the Debtors instituted certain corporate initiatives resulting

---

[4]     In effort to maximize value as part of these restaurant closings, the Debtors have filed a motion for procedures to sell furniture, fixtures and equipment located the recently closed stores as well as certain "quota" licenses related

in transaction-related synergies stemming from the Logan's Acquisition in 2018 and have created a more efficient corporate structure, internal enterprise and operational mechanisms that streamlined operations and cut costs.  Thus, unlike many other restaurants and retailers that filed for chapter 11 protection without a plan to start fixing their business, the Debtors are already well underway with their turnaround strategy and are well-positioned to move forward in a positive direction.

15.     These operational fixes, however, have not been enough to overcome the strain on the Debtors' liquidity caused by their saturated balance sheet. These issues came to a head in late 2019 and early 2020 when the Debtors lacked sufficient cash to make the required interest payment under their Prepetition First Lien Credit Agreement (as defined below) and had breached or were going to breach certain financial covenants thereunder.  As a means to stabilize the situation, the Debtors worked with their advisors, including Katten Muchin Rosenman LLP ("Katten"), as restructuring counsel, and M-III Partners, L.P. ("M-III"), as financial advisor, to find a value-maximizing solution that would fix the Debtors' balance sheet, provide necessary liquidity, and allow the Debtors' restaurants to continue operating in the ordinary course, enabling them to save more than 18,000 jobs, continue business relationships with their landlords and vendors, and serve their millions of loyal customers.

16.     Thereafter, the Debtors, their Board of Managers (the "Board") and their advisors worked around the clock to analyze all possible restructuring scenarios.  As a result of this process, the Board, in consultation with the Debtors' management and advisors, determined

---

to the closing stores. In such motion, the Debtors are also requesting permission to transfer such property and equipment to the applicable landlord in full or partial satisfaction of such landlord's administrative expense claims and unsecured claims.

that a sale and auction process for substantially all of the Debtors' assets in chapter 11 would be the best way to maximize value for all stakeholders.

17.    That sale process is supported by the Prepetition First Lien Lenders, who have committed to provide $23 million of critical and necessary new money loans under the proposed debtor-in-possession financing (the "<u>DIP Facility</u>") which amount after taking into account the roll-up and letter of credit facility, totals $143.1 million.  The financing provided by the DIP Facility allows the Debtors to fund these Chapter 11 Cases and their operations while they market their Assets and seek to consummate a sale transaction.  In addition, the Prepetition First Lien Lenders, which also constitute the DIP Lenders, agreed served as the Stalking Horse Bidder for substantially all of the Debtors' Assets, subject to an auction and sale process pursuant to which the Debtors can select the highest or otherwise best offer as determined in their business judgment. That sale process is already underway as the Debtors' investment banker, Configure Partners, LP ("<u>Configure Partners</u>") has contacted more than 268 parties prior to the Petition Date, including by sending a teaser to more than 239 parties and a confidential information memorandum to more than 27 parties that have executed a customary nondisclosure agreement.

18.    Thus, the Debtors filed these Chapter 11 Cases to complete the open and competitive sale process begun prior to the Petition Date for the sale of substantially all of their assets and business lines with their Prepetition First Lien Lenders serving as the stalking horse bidder.  The Debtors intend to maintain their current operations while this sale process is ongoing and also pursue confirmation of a chapter 11 plan as they believe that is the value-maximizing result for these Chapter 11 Cases and in the best interests of all of their stakeholders.

**C.    The Stalking Horse Agreement and Proposed Sale Order**

19.    The Stalking Horse Agreement was extensively negotiated between the parties at arm's length and in good faith and confers several substantial benefits on the Debtors' estates.  The Stalking Horse Agreement allows the Debtors to continue pursuing a Sale of the Assets while at the same time locking in a purchase price of $138 million for the Assets in the form of a credit bid.  Perhaps most importantly, the Stalking Horse Agreement includes a commitment from the Stalking Horse Bidder to maintain existing operations and employ nearly all the Debtors existing employees without a hiccup in operations.

20.    In accordance with Local Rule 6004-1, the material terms of the Stalking Horse Agreement and proposed Sale Order are set forth in the following table:

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| Purchaser | DBFLF CFTWE Holdings L.P., an affiliate of Fortress Credit Co LLC |
| Sellers | All of the Debtors other than (i) CraftWorks Parent, LLC;  (ii) Craftworks Intermediate Co, LLC; (iii) CraftWorks Holdings, LLC; (iv) CraftWorks Restaurants & Breweries, Inc.; and (v) Logan's Restaurants, Inc. |
| Purchase Price (other than Assumed Liabilities) | $138 million |
| Purchased Assets | All of the, direct or indirect, right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing. |

---

[5]    Capitalized terms used in this table and not otherwise defined herein shall have the meaning ascribed to such term as provided in the Stalking Horse Agreement.

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| Excluded Assets | Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers: <br><br> (i) the Wind Down Cash: <br><br> (ii) the Excluded Bank Account: <br><br> (iii) all alcoholic beverage Inventory of Sellers in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage Inventory in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or other relevant Governmental Entity; <br><br> (iv) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity; <br><br> (v) all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller, other than equity interests in Newco as contemplated by Section 5.10 of the Stalking Horse Agreement; |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | (vi) all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts; |
| | (vii) the Excluded Claims; |
| | (viii) any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees); |
| | (ix) any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset; |
| | (x) all Liquor Licenses associated with any Excluded Restaurants not included on Schedule 7.1 of the Stalking Horse Agreement, or which the Sellers presently hold in safe keeping; |
| | (xi) all Permits other than the Assumed Permits; |
| | (xii) all directors' and officers' liability Insurance Policies, including any tail insurance policies, including the rights of the directors and officers thereunder for coverage (i.e., advancement of expenses and liability coverage with respect to claims made against |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | such officers and directors); <u>provided</u> that for the avoidance of doubt, any proceeds or right to proceeds under such policies payable or paid to a Seller (other than (i) for purposes of paying, reimbursing or advancing the expenses and liability coverage to or on behalf of any director or officer covered under such policy and payable to a third party with respect to claims made against such director or officer) including for damages and reimbursement for losses or otherwise, shall be payable to Buyer as a Purchased Asset from and after the Closing;<br><br>(xiii) all Employee Benefit Plans which are not Assumed Plans;<br><br>(xiv) those assets set forth on <u>Schedule 2.2 of the Stalking Horse Agreement</u>; and<br><br>(xv) the rights of Sellers under this Agreement and the Related Agreements and all consideration payable or deliverable to Sellers under <u>the Stalking Horse Agreement</u>. |
| Assumed Liabilities | Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no others:<br><br>(i) all Cure Amounts under any and all Assumed Contracts; <u>provided</u>, <u>however</u>, that Buyer shall not be obligated to assume or pay any Cure Amounts with respect to the Assumed Contracts set forth on Assumed Contracts List in excess of aggregate cure amount set forth on <u>Schedule 2.3(a) of the Stalking Horse Agreement;</u><br><br>(ii) Liabilities under the Assumed Contracts, Assumed Permits and Assumed Plans arising from and after the Closing Date as well as any Liabilities to the extent arising out of the Purchased Assets or the operation of the |

| Key Terms of Stalking Horse Agreement[5] | |
| --- | --- |
| | Business, in each case, arising from and after the Closing Date; |
| | (iii) to the extent not already paid, all current Liabilities, trade payables and accrued expenses of Sellers (including, for the avoidance of doubt, (a) invoiced accounts payable, (b) accrued but uninvoiced accounts payable and (c) any open purchase orders), to the extent arising exclusively out of the Continuing Restaurants and incurred in the Ordinary Course of Business and related to the period following the Petition Date, other than those owing for Professional Services for retained professionals in the Chapter 11 Cases; |
| | (iv) all accrued payroll, accrued bonuses, severance obligations, accrued and unused vacation, or other accrued paid time-off, and accrued payroll Taxes, in each case, that is earned or accrued by, but not yet payable to, as of the Closing Date (and not paid by Sellers prior thereto) any Transferred Employee (but not any other Current Employees or former employees) incurred in the Ordinary Course of Business and arising and related to the period following the Petition Date; |
| | (v) all Liabilities relating to the employment, or termination of employment, of the Transferred Employees from and after the Closing Date, including, without limitation any Liabilities arising under the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses; |
| | (vi) any Liabilities under COBRA for M&A Qualified Beneficiaries (within the meaning of COBRA); |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | (vii) all gift card obligations, customer reward programs and similar incentive programs of Sellers as of the Closing Date (including any escheatment claims); |
| | (viii) Liabilities expressly assumed by Buyer under the Stalking Horse Agreement; and |
| | (ix) Transfer Taxes. |
| | Notwithstanding the foregoing, Assumed Liabilities shall not include any post-petition Liabilities of the Sellers that were incurred in violation of the DIP Order or the DIP Loan Documents. |
| Excluded Liabilities | Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities. |
| Transferred Employees | Buyer shall offer employment to such identified employees listed on the Employee Roster to the extent such identified employee is a Current Employee and remains a Current Employee as of immediately prior to the Closing on such employment terms as Buyer may determine in its sole discretion. |
| Use of Names and Trademarks | Neither Sellers nor any of their Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Purchased Assets. |
| Releases | Mutual release by the parties to the Stalking Horse Agreement. |
| Interim Arrangements | |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| Transition Services | Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Entity or third party with respect to any Liquor Licenses and obtaining any Liquor License Approval, including by entering into the Management Agreement and, if reasonably requested by Buyer, initiating and/or participating, at Buyer's sole cost and expense, in such Litigation reasonably requested by Buyer to obtain such Liquor License Approvals. |
| Seller's Knowledge | The actual knowledge, after due inquiry, of Hazem Ouf, Jim Lebs, Bill Streitberger, and Randy Scruggs. |
| Schedule Update | Until the date that is fifteen (15) days after the date of the Stalking Horse Agreement, Sellers shall be permitted in their sole discretion to update the Schedules and Disclosure Schedules; provided, however, that any updates to the Schedules 1.1(a), 1.1(b), 2.1(t), 2.3(a), and 2.6(a) of the Stalking Horse Agreement may only be made with the consent of the Buyer, such consent shall not be unreasonably withheld. |
| Representations and Warranties | Includes the following subject matters: (i) Organization, (ii) Authority; (iii) Noncontravention; (iv) Compliance with Laws; (v) Title to Assets; (vi) Contracts; (vii) Intellectual Property; (viii) Litigation; (ix) Employee Matters and Employee Benefits; (x) Real Estate; (xi) Permits; (xii) Inventory; (xiii) Environmental Matters; (xiv) Financial Statements; (xv) Taxes; and (xvi) Suppliers. |
| Due Diligence Conditions | Buyer has a unilateral right to terminate the Stalking Horse Agreement in the event it is not satisfied with due diligence. |
| Financing Conditions | None. |
| Closing Conditions | Sellers' Closing Conditions<br><br>(i) as of the date hereof and as of the Closing (in each case, except to the extent (1) for any |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | representation or warranty that is expressly made as of a specified date, in which case as of such specified date, (2) subject to any Schedule Update), (i) each representation or warranty contained in Section 3.1, Section 3.2 or Section 3.3 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;<br><br>(ii) Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);<br><br>(iii) the applicable waiting period under the HSR Act will have expired or been terminated;<br><br>(iv) no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing; |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | (v) the amount of Cure Amounts paid with respect to the Assumed Contracts set forth on the Assumed Contracts List does not, in the aggregate, exceed the Cure Amount Cap; |
| | (vi) Buyer shall have received all of the Consents from third parties (including any Governmental Entities) and Assumed Permits (including Liquor Licenses Approvals), except to the extent such Assumed Permits (including Liquor Licenses Approvals) are to be transitioned under the Management Agreement (including Liquor Licenses Approvals pursuant to Section 6.1), in each case, as listed on Schedule 7.1 (as the same may be revised, amended or modified by Buyer in its sole discretion up until the Auction); |
| | (vii) the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; |
| | (viii) no Default or Event of Default shall have occurred and be continuing under the DIP Loan Agreement (as such terms are used therein); |
| | (ix) The DIP Order and DIP Loan Documents shall have been approved and shall not have been terminated; |
| | (x) from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; |
| | (xi) Buyer shall have received all of the deliverables pursuant to Section 2.9(a); and Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(j) has been satisfied. |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | Buyer's Closing Conditions |
| | (i) as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded; |
| | (ii) Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing); |
| | (iii) the applicable waiting period under the HSR Act will have expired or been terminated; |
| | (iv) no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | making the Closing illegal or otherwise prohibiting the consummation of the Closing;<br><br>(v) the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal;<br><br>(vi) Sellers shall have received all of the deliverables pursuant to Section 2.9(b); and Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied. |
| Closing Date | The second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. |
| Termination Events | (i) by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;<br><br>(ii) by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of a Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 0 if the issuance of such Decree was caused by the breach or action or inaction of such Party; |

| **Key Terms of Stalking Horse Agreement**[5] | |
|---|---|
| | (iii) by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date; |
| | (vi) by written notice of either Buyer or Sellers, if any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases; |
| | (v) by Buyer, if (i) the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before such date as provided in the DIP Documents, (ii) the Auction has not concluded by midnight on such date as provided in the DIP Documents, (iii) the Sale Order shall not have been entered by the Bankruptcy Court on or before such date as provided in the DIP Documents, (iv) at any time after entry of the Sale Procedures Order, such Sale Procedures Order (including, without limitation, the provisions therein relating to the bid protections) is reversed, stayed, vacated or otherwise modified by the Bankruptcy Court, or (v) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified; |
| | (vi) by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long |

| Key Terms of Stalking Horse Agreement[5] |
|---|

| | as all other conditions of Buyer have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;<br><br>(vii) by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Sellers has notified Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Sellers have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers;<br><br>(viii) by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.7(d);<br><br>(ix) by written notice from Buyer to Sellers upon the occurrence of any Event of Default (as defined in the DIP Order or any DIP Loan Documents); |

| Key Terms of Stalking Horse Agreement[5] | |
|---|---|
| | (x) by Buyer if any secured creditor of any Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets; |
| | (xi) by Buyer if any Affiliates of the Sellers that, directly or indirectly through one or more intermediaries, controls Sellers, files for relief pursuant to the Bankruptcy Code; |
| | (x) by Buyer if, at any time on or before the expiration of the Due Diligence Period, Buyer finds any matter discovered in its due diligence investigation unacceptable in its sole discretion; |
| | (xi) automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon: (a) the Sellers' entry into a stalking horse agreement with another purchaser for the Purchased Assets consistent with the terms of the Sale Procedures Order; (b) approval by the Bankruptcy Court of an Alternate Transaction, unless Buyer has agreed to be a "back-up bidder" under the Sale Order; or (c) the consummation of an Alternate Transaction. |

21.     The Stalking Horse Bidder has not requested a breakup fee or an expense reimbursement.

**D.      The Need for a Timely Process**

22.      The Debtors' propose to conduct the sale process and Auction on the following timeline:[6]

| Bid Procedures Motion Objection Deadline | March 24, 2020 |
|---|---|
| Hearing on Bid Procedures and Sale Motion | April 1, 2020 |
| Assumption and Assignment Notice Service Deadline | April 24, 2020 |
| Sale Objection Deadline | May 15, 2020 |
| Cure/Assignment Objection Deadline | May 15, 2020 |
| Adequate Assurance Objection Deadline | May 15, 2020 |
| Bid Deadline | May 15, 2020 |
| Auction | May 19, 2020 |
| Assignment Notice Service Deadline | May 20, 2020 |
| Sale Hearing | May 22, 2020 |
| Closing Date | June 1, 2020 |

23.      The Debtors believe that conducting a sale process for the Assets according to this timeline will produce a fair and robust auction and will provide their estates with the best opportunity to maximize the value of the Assets.  At the same time, the Debtors will continue to evaluate any other strategic alternatives that may be identified.

**E.      Proposed Bid and Notice Procedures**

24.      The Debtors are requesting that the Court approve the Bid Procedures for the Sale of the Assets.  The following is a summary of the proposed Bid Procedures that contains the key terms that are required to be highlighted pursuant to Local Rule 6004-1(c):[7]

**I.      Overview**

Debtors will seek authority to sell the Assets in a single or multiple transactions free and clear of liens, claims, interests and encumbrances to the Qualified Bidder (as defined below) that is determined to have made the highest

---

[6]      The form of Bid Procedures Order and Bid Procedures contain dates proposed by the Debtors.  These dates are subject to the availability of the Court and may change.

[7]      The following summary is qualified in its entirety by reference to the provisions of the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order.  In the event of any inconsistencies between the provisions of the Bid Procedures and the terms set forth herein, the terms of the Bid Procedures will govern.  Capitalized terms used in this summary and not otherwise defined herein have the meanings given to them in the Bid Procedures.

or otherwise best bid for the Assets in accordance with the Bid Procedures set forth below.  In conjunction with the Sale, the process provides for the assumption by the Debtors and the assignment to the Prevailing Bidders of certain executory contracts and unexpired leases, which the Prevailing Bidders and/or the Debtors may designate pursuant to the Bid Procedures Order.

Pursuant to the Bid Procedures Order, the Bankruptcy Court authorized the Debtors to enter into that certain Asset Purchase Agreement by and among Craftworks Holdings, LLC, CraftWorks Restaurants and Breweries, Inc., Logan's Restaurants, Inc., each of the Other Seller Parties thereto, and DBFLF CFTWE Holdings L.P., dated as of March 3, 2020, (as amended from time to time, the "Stalking Horse Agreement").  The Stalking Horse Purchaser proposes to (a) purchase, acquire, and take assignment and delivery of the Assets and (b) assume certain Assumed Liabilities.

An objection by any party seeking to object to the Sale of the Debtors' Assets to the Prevailing Bidder – other than an objection to the proposed assumption and assignment of the Identified Contracts and Leases or to any proposed Cure Costs or Adequate Assurance must: (a) be in writing; (b) clearly specify the grounds for the objection; (c) conform to the Bankruptcy Rules and the Local Rules; and (d) be filed with the Court and served on the Objection Notice Parties (as defined herein) so as to be received by **no later than 4:00 p.m. (prevailing Eastern Time) on May 15, 2020** (the "Sale Objection Deadline").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

The Debtors and their advisors, in consultation with counsel to the Prepetition First Lien Agent / DIP Agent and any official committee appointed in these Chapter 11 Cases (collectively the "Consultation Parties"), shall (a) determine whether any person is a Qualified Bidder, (b) coordinate the efforts of Potential Bidders (as defined below) in conducting their due diligence investigations, (c) receive offers from Potential Bidders and (d) negotiate any offers made to purchase the Assets.

To the extent permitted in and subject to the Bid Procedures Order, the Debtors reserve the right to modify or waive certain or all of the Bid Procedures, after consultation with the Consultation Parties and the Stalking Horse Purchaser.

II.    **Participation Requirements and Due Diligence**

A.    In order to participate in the bidding process, the Auction, or otherwise be considered for any purpose hereunder, a person interested in purchasing the Assets (a "Potential Bidder") must deliver to the Debtors and their counsel an executed confidentiality agreement in form and substance satisfactory to the Debtors (the "Confidentiality Agreement").  Without limiting the foregoing sentence, the Confidentiality Agreement will provide that all non-

public information about the Debtors received by a Potential Bidder, or if the bidder is qualified, a Qualified Bidder, will be kept strictly confidential and used only in connection with analyzing a transaction for the Assets.

B.      Any Potential Bidder wishing to conduct due diligence concerning a prospective acquisition of the Assets shall be granted access to all relevant information regarding the Assets and the related business of each of the Debtors reasonably necessary to enable a Potential Bidder to evaluate the Assets and the prospective transaction.  The Debtors shall make such access available to Potential Bidders during normal business hours as soon as reasonably practicable following execution of the Confidentiality Agreement.  Potential Bidders interested in conducting due diligence should contact Configure Partners, LLC, 368 9th Ave., New York, NY 10001 Attn: Vin Batra (vbatra@configurepartners.com) and 3340 Peachtree Rd NE, Suite #1010, Atlanta, GA 30326 Attn: James Hadfield (jhadfield@configurepartners.com).  Notwithstanding the foregoing, the Debtors and their advisors are not required to provide confidential or proprietary information to any person if the Debtors, in consultation with the Consultation Parties, believe that such disclosure would be detrimental to the interests of the Debtors' estates.  All due diligence must be completed before the Bid Deadline (as defined below).  No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline.  Potential Bidders are required to exercise their own discretion before relying on any information regarding the Assets provided by the Debtors.  Neither the Debtors nor their representatives are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

C.      The Debtors and their advisors, in consultation with the Consultation Parties, shall:  (i) receive and evaluate any Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under the Bid Procedures.

III.    <u>Submission of Bids</u>

A.      Any Potential Bidder interested in purchasing the Assets must submit a Bid by **no later than 4:00 p.m. (prevailing Eastern Time) on May 15, 2020** (the "<u>Bid Deadline</u>").  The Debtors may extend the Bid Deadline, and shall promptly notify all Potential Bidders of any such extension.  In order for such Bid to be considered, however, it must be a "Qualified Bid."  The Debtors and their advisors, in consultation with the Consultation Parties, will determine if a Bid is a Qualified Bid based on the requirements herein. A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtors and their advisors in consultation with the Consultation Parties, determine

that such Potential Bidder submitted either a Qualified Aggregate Bid or a Qualified Partial Bid (each as defined below).  The Stalking Horse Purchaser, or its designee, shall be deemed a Qualified Bidder for all purposes under the Bid Procedures, and the Bid submitted by the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement shall be deemed to be a Qualified Bid for all purposes under the Bid Procedures.

B.      A Bid will be considered a "Qualified Aggregate Bid" only if the Bid fulfills the following requirements prior to the Bid Deadline (capitalized terms used in this section are defined later in the Bid Procedures):

  i.      Provides that the Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (X) thirty (30) days following the date of entry of a Sale Order; (Y) the date of the closing of the Sale of the Assets pursuant to the Sale Order; or (Z) such date as the Debtors affirm in writing that they do not intend to pursue a Sale transaction based on such Qualified Bidder's Bid (the "Bid Expiration Date");

  ii.     Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

  iii.    Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtors, in consultation with the Consultation Parties;

  iv.     Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of an asset purchase agreement (an "APA"), or a representation that no such authorization or approval is required;

  v.      Provides that the purchase price will be paid in cash, cash equivalents, assumption of debt, or such other consideration acceptable to the Debtors, in consultation with the Consultation Parties;

  vi.     Provides by wire transfer of immediately available funds to the Debtors or an appropriate escrow agent before the Bid Deadline of an earnest money deposit equal to the greater of (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value otherwise ascribed to such Bid (the "Good Faith Deposit");

vii.   Provides evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval and any other consents, licenses, or permits, if any is required, to purchase the Assets;

viii.  Is submitted in a writing in the form of an APA with any proposed changes to the Stalking Horse Agreement set forth in an electronic form both clean and marked against the Stalking Horse Agreement to reflect such changes made by the Qualified Bidder, that:

1.   Identifies the Qualified Bidder and any members of its investor group, if applicable;

2.   Is not subject to conditions, representations or terms that the Debtors determine, in consultation with the Consultation Parties, to be unacceptable;

3.   Specifies the consideration allotted to each Asset, or class of Assets, as applicable, such Qualified Bidder proposes to purchase pursuant to the APA;

4.   Is not conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment;

5.   Does not contain any financing or due diligence contingencies to closing of the proposed transaction;

6.   Does not contain any condition to closing of the transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court and required regulatory approval);

7.   Expressly acknowledges and represents that the Qualified Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Assets and the proposed transaction prior to making its Bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Assets in making its Bid or that of any of its legal, financial or other advisors, and (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as

26

expressly stated in the representations and warranties contained in the APA ultimately accepted and executed by the Debtors;

8. Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtors to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid; and

ix. Contains other information reasonably requested by the Debtors.

C. A "Qualified Partial Bid" for less than substantially all of the Assets will be considered for the Auction, and Qualified Bidders submitting Qualified Partial Bids shall be allowed to participate in the Auction only if the Qualified Partial Bid, or the Qualified Partial Bid when combined with other additional non-overlapping Qualified Partial Bids, if accepted and executed without modification, would yield individual asset sales amounting to a Qualified Aggregate Bid or would otherwise exceed the value of or be considered a better offer than any Qualified Aggregate Bid after considering, among other things, the Bid Assessment Criteria (as defined below). Bids that offer to purchase only a portion of the Debtors' Assets may, at the discretion of the Debtors after consultation with the Consultation Parties, not be considered Qualified Partial Bids. The Debtors, in consultation with the Consultation Parties, shall determine which non-overlapping Qualified Partial Bids to include in determining whether they amount to a Qualified Aggregate Bid, and shall assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Bids against all other Qualified Bids. To constitute a Qualified Partial Bid, a Bid must fulfill the following requirements prior to the Bid Deadline:

i. Fulfills each of the requirements set forth in paragraphs (B)(i) through and including (B)(ix) above;

ii. Conspicuously state that the Qualified Bidder offers to purchase a portion of the Assets, which assets shall be described in detail; and

iii. Fully disclose the identity of each entity participating in connection with such Bid, and the complete terms of any such participation.

D. A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to the following representatives of the Debtors: Configure Partners, LLC, 368 9th Ave.,

New York, NY 10001 Attn: Vin Batra (vbatra@configurepartners.com) and 3340 Peachtree Rd NE, Suite #1010, Atlanta, GA 30326 Attn: James Hadfield (jhadfield@configurepartners.com).  The Debtors shall deliver copies of any such Bids to the Consultation Parties.

E.     Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another and the Debtors may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, all bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

F.     After the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall determine which Qualified Aggregate Bid or group of Qualified Partial Bids represents the then-highest or otherwise best Bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder").  Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid or a Qualified Partial Bid will be advised of such Initial Highest Bid and the Debtors may, at their discretion: (a) distribute copies of other Qualified Aggregate Bids or Qualified Partial Bids to other Qualified Bidders prior to or during the Auction; or (b) proceed with the open or sealed bidding process set forth in the Bid Procedures Order to the extent authorized therein.

IV.     **Due Diligence from Potential Bidders or Qualified Bidders**

A.     Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Assets. Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtors to determine that a Potential Bidder is not a Qualified Bidder.  Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition of the Assets as the Auction progresses.  Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtors to determine that the Qualified Bidder may no longer participate in the Auction.

V.     **"As Is, Where Is"**

A.     The Sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates or any other party, except to the extent set

forth in the APA between the Debtors and the Prevailing Bidder. Except as otherwise provided in the Prevailing Bidder's APA, all of the Debtors' right, title and interest in and to the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Claims") pursuant to section 363(f) of the Bankruptcy Code, such Claims to attach to the net proceeds of the Sale of the Assets, with the same validity and priority as existed immediately prior to such Sale.

## VI.    **The Auction**

A.    If more than one Qualified Bid has been submitted for the Assets in accordance with these Bid Procedures, the Debtors will conduct the Auction on **May 19, 2020, at 10:00 a.m. (prevailing Eastern Time)**, with respect to such Qualified Bids in order to determine the Prevailing Bid to submit for approval by the Bankruptcy Court at the Sale Hearing. The Auction shall be organized and conducted by the Debtors, at the offices of their counsel, Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, New York 10022, or such other location as may be announced prior to the Auction to all Qualified Bidders and the Consultation Parties. Bidding at the Auction will be transcribed by a court reporter.

B.    The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder (the "Auction Participants"). While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended by the Debtors, the Debtors' advisors, the Consultation Parties, the U.S. Trustee, along with any other party the Debtors deem appropriate. All creditors of the Debtors' estates shall be permitted to attend; provided, however, that in order to attend the Auction, a creditor must advise the Debtors in writing no later than 48 hours prior to the Auction; provided, further, however, that the Debtors may seek relief from the Bankruptcy Court in the event that they object to such creditor's attendance.

C.    The Debtors are authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the discretion of the Debtors, in consultation with the Consultation Parties, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

D.    The Qualified Bid that is deemed the Initial Highest Bid, determined as set forth above, shall be the first Qualified Bid to begin the Auction. The next Qualified Bid at the Auction shall be an amount equal to or greater than the Initial Highest Bid plus the Minimum Bid Increment (as defined below).

Thereafter, the Auction will continue in the manner determined by the Debtors above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in increments greater than the prior Qualified Bid plus $250,000 or such other increment as determined by the Debtors, in consultation with the Consultation, and announced at the start of or during the Auction (the "Minimum Bid Increment").

E.      In the case of a Qualified Bid based upon Qualified Partial Bids, such Qualified Bid may be altered or re-submitted in the sole discretion of the Qualified Bidders, provided that such Bid remains a Qualified Partial Bid in accordance with the requirements set forth in paragraph III.(B) above.  A Qualified Partial Bid will be considered for any given round of the Auction only if such Bid individually or in combination with other Qualified Partial Bids yields a Qualified Aggregate Bid (individually, a "Qualified Partial Overbid" and collectively, a "Qualified Aggregate Overbid"), provided that the Qualified Aggregate Overbid must, considered as a whole, meet all the requirements of paragraph (D) above.  The Debtors shall, in consultation with the Consultation Parties, determine which Qualified Partial Overbids to include in the Qualified Aggregate Overbid, and shall, in each round of the Auction, as necessary, assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Overbid as against all other Qualified Bids received in that round of the Auction.

F.      The Debtors in consultation with the Consultation Parties, shall determine, and subject to final determination by the Bankruptcy Court, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

G.      At the conclusion of the Auction:  (i) the Debtors shall, in consultation with the Consultation Parties, select (X) the Prevailing Bid(s) and (Y) the second highest or best offer for the Assets (the "Back-Up Bid"); (ii) the Debtors shall notify the Prevailing Bidder that such person's offer has been determined by the Debtors to be the Prevailing Bid and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder") that such person's offer has been determined by the Debtors to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Bankruptcy Court approval; and (iii) the Debtors shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder or Bidders.  Prior to the commencement of the Sale Hearing, the Prevailing Bidder or Bidders shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder or Bidders to all of the terms and conditions contemplated by the Prevailing Bid.

H.    In making the determination of which Qualified Bid(s) constitutes the Prevailing Bid(s), the Debtors may, in consultation with the Consultation Parties, take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, including, but not limited to: (a) the number, type, and nature of any changes to the Stalking Horse Agreement requested by the Qualified Bidder, including the type and amount of the Assets sought and the liabilities of the Debtors to be assumed in the Bid; (b) the amount and nature of the total consideration, including the extent of assumed liabilities; (c) the likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof, including whether the Bidder has or can obtain all necessary consents, licenses, permits, or other regulatory approvals to operate the Assets sought in the Bid; (d) any excluded assets, executory contracts, or unexpired leases; (e) any purchase price adjustments; (f) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid; (g) whether the Bid is a bulk bid or a partial bid for only some of the Assets; and (h) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

I.    The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtors against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court.

J.    The Debtors shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtors' acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

VI.    **Back-Up Bidder**

A.    If for any reason the Prevailing Bidder fails to consummate the acquisition of the Assets in accordance with the Prevailing Bid, and in any event no later than fifteen (15) days from the entry of the Sale Order, the Debtors are authorized to proceed with the Sale of the applicable Assets to the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Bankruptcy Court so long as the Sale to the Back-Up Bidder is approved at the Sale Hearing, or upon further hearing and order of the Bankruptcy Court; provided, however, solely with respect to any assumption and assignment of the Potential Designated Contracts to the Back-Up Bidder, a hearing shall be held on no less than five (5) business days' notice, with objections due at least one (1) day prior to such hearing, unless otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, the scope of such hearing shall be limited to issues relating to the identity of the Back-Up Bidder such as adequate assurance of future performance, and the

assumption and assignment of any Potential Designated Contacts to the Back-Up Bidder. If for any reason the Back-Up Bidder fails to consummate the acquisition of the Assets in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtors and such forfeited Deposit shall constitute collateral of the Prepetition First Lien Agent / DIP Agent, and be subject to the debtor-in-possession financing orders.

## VII.    Deposit

A.    No later than the Bid Expiration Date, the Debtors shall return to each Qualified Bidder(s), other than the Prevailing Bidder and the Back-Up Bidder, their respective Deposit(s). No later than the seventh (7th) business day after the closing of the Sale of the Assets to the Prevailing Bidder, the Debtors shall return the Back-Up Bidder's Deposit to the Back-Up Bidder.

## VIII.    Modifications

A.    The Debtors, in consultation with the Consultation Parties, may (a) extend the deadlines set forth in the Bid Procedures Order or the Bid Procedures, (b) waive any requirement for a Bid to be a Qualified Bid or to be the Prevailing Bid, including, but not limited to, designating one or more Qualified Partial Bids for less than substantially all of the Assets as the Prevailing Bid or Prevailing Bids, and/or (c) adopt, implement, and/or waive such other, additional or existing procedures or requirements that in their discretion serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend the Auction or participate in the Auction, as appropriate.

B.    The Debtors, in consultation with the Consultation Parties, may (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Sale Order approving the Prevailing Bid, any Bid that, in the discretion of the Debtors, in consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in this case.

25.    The Debtors reserve the right to modify the Bid Procedures as necessary,

including, without limitation, any deadlines thereunder, if such modification is determined by the

Debtors, in consultation with their advisors, counsel to the Prepetition First Lien Agent / DIP Agent and any official committee appointed in these Chapter 11 Cases (collectively the "Consultation Parties"), as they deem appropriate to maximize value for the Debtors' estates and creditors. In addition, the Debtors reserve their right, after consultation with the Consultation Parties, to withdraw any or all Assets from the Sale at any time prior to the Court's approval of such Sale.

26.    Debtors will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted and the Prevailing Bidder was properly selected in accordance with these Bid Procedures; (b) the Auction was fair in substance and procedure; and (c) consummation of the Sale by the Prevailing Bidder will provide the highest or otherwise best value for the Assets and is in the best interests of the Debtors, their estates and creditors.

27.    The Debtors believe that the Bid Procedures are fair and reasonable, and are not likely to dissuade any serious potential purchaser from bidding for the Assets.

**F.      Form and Manner of Sale Notice**

28.    By no more than three (3) business days after entry of the Bid Procedures Order, the Debtors will serve a copy of the Motion, the Bid Procedures Order and the Sale Notice, the form of which is attached to the Bid Procedures Order as **Exhibit 3**, upon the Notice Parties. As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m)(iv).

29.    By no more than three (3) business days after entry of the Bid Procedures Order, the Debtors shall (a) publish the Order and the Sale Notice in the *Wall Street Journal*; and

(b) post the Motion, the Bid Procedures Order, the Sale Notice and the Bid Procedures on the website maintained by the Debtors' claims and noticing agent, Prime Clerk, LLC, located at https://www.primeclerk.com/craftworks (the "Prime Clerk Website").

**G.      Assumption and Assignment Procedures**

30.     The Debtors are also seeking approval of certain procedures (the "Assumption and Assignment Procedures") to facilitate the fair and orderly assumption by the Debtors and the assignment to the Prevailing Bidder of certain proposed Contracts and Leases in connection with the Sale (the "Identified Contracts and Leases").

31.     The Debtors will file and serve on all counterparties their Contracts and Leases, by no later than **April 24, 2020** (the "Assumption and Assignment Service Deadline"), the Assumption and Assignment Notice, the form of which is attached to the Bid Procedures Order as **Exhibit 4**, on each non-Debtor counterparty ("Non-Debtor Counterparty") whose Contract or Lease may be assumed and assigned to the Prevailing Bidder.  With respect to unexpired leases, the  Debtors will serve the Assumption and Assignment Notice on the notice party at the notice address each as set forth in the applicable lease as well as on any counsel who has entered an appearance in these cases on behalf of such landlord.

32.     The Debtors will attach to the Assumption and Assignment Notice a list identifying the Non-Debtor Counterparties to the Identified Contracts and Leases and the proposed payment amount necessary to cure any defaults arising under any Identified Contract or Lease  (the "Cure Amounts") as of the Petition Date.

33.     Objections, if any, to (a) the proposed cure amounts, (b) the proposed assumption and assignment of the Identified Contracts and Leases, or (c) whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance

to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with the Court and served on the following parties so as to be received **no later than 4:00 p.m. (prevailing Eastern Time) on May 15, 2020** (the "Cure/Assignment Objection Deadline"):  (i) counsel to the Debtors, Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, New York 10022, Attn:  Steven J. Reisman, Esq. and Bryan M. Kotliar, Esq. and 525 W. Monroe Street, Chicago Illinois, 60661, Attn:  Peter A. Siddiqui, Esq.; (ii) counsel to the Prepetition First Lien Agent / DIP Agent, King & Spalding LLP , 1180 Peachtree Street, NE, Suite 1600, Atlanta, GA 30309, Attn: W. Austin Jowers, Esq. and Hunton Andrews Kurth LLP, Bank of America Plaza, 600 Peachtree Street, NE, Suite 4100, Atlanta, GA 30308, Attn: John R. Schneider; (iii) counsel to any statutory committee appointed in these cases; and (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801, Attn: Linda Casey (the foregoing (i) through (iv), the "Objection Notice Parties").

34.    Where a Non-Debtor Counterparty to an Identified Contract or Lease files an objection as set forth in the immediately preceding paragraph, objecting to the assumption by the Debtors and assignment to the Prevailing Bidder of such Identified Contract or Lease (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Amounts listed on the Assumption and Assignment Notice (the "Disputed Cure Amounts"), the Debtors and the Non-Debtor Counterparty will meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Amounts will be determined by the Court at the Sale Hearing, unless the Debtors, the Prevailing Bidder and the Non-Debtor

Counterparty to the Identified Contract or Lease in dispute agree otherwise or the Court orders otherwise.  If the Court determines at the Sale Hearing that the Identified Contract or Lease will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered an Identified Contract or Lease.  If any objection related to a Disputed Designation or Disputed Cure Amounts is continued beyond the Sale Hearing, the Prevailing Bidder shall escrow the portion of the Cure Amounts at the Closing pending such resolution.

35.    If no objections are timely filed by the Cure/Assignment Objection Deadline, absent further order of the Court, with respect to any Identified Contract or Lease, then the Cure Amounts set forth in the Assumption and Assignment Notice will be binding upon the Non-Debtor Counterparty to such Identified Contract or Lease for all purposes and will constitute a final determination of the Cure Amounts required to be paid by the Debtors and the Prevailing Bidder in connection with the assumption and assignment of such Contract or Lease.  In addition, all Non-Debtor Counterparties to such Identified Contracts and Leases who fail to file an objection before the Cure/Assignment Objection Deadline, shall be (a) forever barred from objecting to the Cure Amounts and adequate assurance of future performance with respect to the Identified Contracts and Leases, and the Debtors and the Prevailing Bidder will be entitled to rely solely upon the Cure Amounts; (b) deemed to have consented to the assumption and assignment of the Identified Contract or Lease; and (c) forever barred and estopped from asserting any additional cure or other amounts against the Debtors, their estates, or the Prevailing Bidder, on all grounds other than proposed adequate assurance of future performance Prevailing Bidder.

36.    Except as may otherwise be agreed to in an asset purchase agreement with a Prevailing Bidder or by the parties to an Identified Contract or Lease, the defaults under the Identified Contract or Lease that must be cured in accordance with section 365(b) of the

Bankruptcy Code shall be cured as follows: without any reduction of, or credit against, the amount of the Prevailing Bid, the Purchaser shall pay all Cure Amounts relating to an assumed executory contract or unexpired lease within ten days after the later of (a) the closing date specified in the asset purchase agreement entered into with a Prevailing Bidder or (b) the date on which such executory contract or unexpired lease is deemed assumed and assigned.

37.    Objections, if any, to the adequate assurance of future performance with respect to the Stalking Horse Bidder or with respect to any Qualified Bidder other than the Stalking Horse Bidder must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received **no later than 4:00 p.m. (prevailing Eastern Time) on May 15, 2020** (the "Adequate Assurance Objection Deadline").  Any Non-Debtor Counterparty to an Identified Contract or Lease who fails to timely file an objection to the proposed adequate assurance of future performance by the Adequate Assurance Objection Deadline, absent further order of the Court is deemed to have consented to the assumption and assignment of such Identified Contract or Lease by the Debtor and to the Prevailing Bidder.

38.    Upon written request of a Non-Debtor Counterparty to an Identified Contract or Lease made prior to the expiration of the Adequate Assurance Objection Deadline, the Stalking Horse Bidder and/or Debtors shall supply adequate assurance of future performance information as may be required by section 365 of the Bankruptcy Code with respect to the Stalking Horse Bidder on a confidential basis to such requesting party within three (3) business days of such request.  Upon written request of Non-Debtor Counterparty to an Identified Contract or Lease made prior to the expiration of the Adequate Assurance Objection Deadline, a Qualified Bidder, other than the Stalking Horse Bidder, and/or Debtors shall supply adequate assurance of future performance information as may be required by section 365 of the Bankruptcy Code with respect

to any Qualified Bidder other than the Stalking Horse Bidder, on a confidential basis to such requesting party within twenty-four (24) hours of such request.

39.     The Debtors will file and serve by no later than May 20, 2020 (the "Assignment Service Deadline"), the Assignment Notice, the form of which is attached to the Bid Procedures Order as **Exhibit 5**, on each Non-Debtor Counterparty to an Assigned Contract.  With respect to unexpired leases, the Assignment Notice shall be served on the notice party at the notice address each as set forth in the applicable lease as well as on any counsel who has entered an appearance in these cases on behalf of such landlord.

## BASIS FOR RELIEF

### A.     The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should be Approved

40.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Culp,* 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper,* 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper); see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

41.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Adams Res. Expl. Corp.,* No. 17-10866 (KG), at 12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.,* 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards,* 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.,* 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources,* 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

42.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., In re Dura Auto, Sys.,* 379 B.R. 257, 263 (Bankr. D. Del. 2007); *Integrated Resources,* 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

43.     The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets.  The proposed Bid Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction.  Specifically, the Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed Bid.

44.     At the same time, the Bid Procedures provide the Debtors with a robust opportunity to consider competing Bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

45.     The Debtors submit that the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District and others.  *See e.g., In re Barneys New York, Inc.,* No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 6, 2019); *In re Z Gallerie, LLC,* No. 19-10488 (KBO) (Bankr. D. Del. Mar. 11, 2019); *In re Things Remembered, Inc.,* No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019); *In re Argos Therapeutics Inc.,* No. 18-12174 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings Inc.,* No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *In re*

*GAL Liquidating Corp.,* No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017); *In re TerreStar Networks, Inc.,* No. 10-15446 (SHL) (Bankr. S.D.N.Y. Feb. 16, 2011).

**B.      Approval of Assumption and Assignment Procedures and Notices**

46.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject and executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

47.      The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1983).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly

cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

48.    Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party. 11 U.S.C. § 365(f); *see also In re Rickel Home Ctr., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) of the Bankruptcy Code is to assist the trustee in realizing the full value of the debtor's assets).

49.    Section 365(f)(2)(B) requires, however, that adequate assurance of future performance by an assignee exist. 11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment. *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "materially and economically" significant. *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).  The meaning of "adequate assurance of future performance" depends upon the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has

financial resources and has expressed willingness to devote sufficient funding to business to give it a strong likelihood of success).

50.     Central to the Debtors' proposed Sale is the assumption and assignment of the Contracts and Leases. It is thus an appropriate exercise of business judgment for the Debtors to propose that purchasers may direct the Debtors to assume and assign to them the contracts and leases that will be required in connection with the Sale.  The assumption and assignment of the Assumed and Assigned Agreements will be subject to the final approval by the Court. Additionally, the Debtors submit that the objection deadline for counterparties to raise objections to the assumption and assignment of contracts and leases, as proposed in this motion, are adequate to protect the rights of counterparties to the Debtors' contracts and leases.  Finally, the Debtors submit that the Assumption and Assignment Notice provides adequate notice of the proposed assumption and assignment of counterparties' contracts and/or leases and should be approved.

## NOTICE

51.     The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the seventy-five (75) largest unsecured claims against the Debtors on a consolidated basis; (c) King & Spalding LLP and Hunton Andrews Kurth LLP, as counsel to the agent under the Debtors' prepetition first lien debt facility and the Debtors' proposed debtor-in-possession financing facility and Stalking Horse Bidder (d) Morgan, Lewis & Bockius, LLP, as counsel to the agent under the Debtors' prepetition second lien debt facility, (e) all other holders of other debt instruments issued by the Debtors; (f) all parties asserting liens against the Debtors' assets; (g) counsel to equity holders of CW Parent; (h) the state attorneys general for all states in which the Debtors operate; (i) the U.S. Attorney's Office for the District of Delaware; (j) the Internal Revenue Service; and (k) any party that requests service pursuant to

Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### NO PRIOR REQUEST

52.    No prior request for the relief sought herein has been made to this or any other court.

[*Remainder of page left blank intentionally*]

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Bid Procedures Order in substantially the form attached hereto (b) enter the Sale Order after the Sale Hearing; and (c) grant such other and further relief as may be just and proper.

Dated: March 3, 2020
Wilmington, Delaware

*/s/ Domenic E. Pacitti*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

-and-

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Morton R. Branzburg (*pro hac vice* pending)
1835 Market Street, 14th Floor
Philadelphia, PA 19103
Telephone: (215) 569-2700
Facsimile: (215) 568-6603

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman (*pro hac vice* pending)
Bryan M. Kotliar (*pro hac vice* pending)
575 Madison Avenue
New York, NY 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8876

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Peter A. Siddiqui (*pro hac vice* pending)
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*