**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| **CRAFTWORKS PARENT,** | ) Case No. 20-10475 (BLS) |
| **LLC,** *et al.,* | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Re:  Docket Nos. 10, 72 |
| | ) |
| | ) Obj. Deadline: 3/23/20, 4:00 p.m. |
| | ) Hearing Date: 4/3/20, 10:00 a.m. |
| | ) |

**OBJECTION OF CERTAIN UTILITY COMPANIES**
**TO THE MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS**
**(I) DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE**
**UTILITY SERVICES; (II) PROHIBITING UTILITY PROVIDERS FROM ALTERING,**
**REFUSING, OR DISCONTINUING UTILITY SERVICES; (III) ESTABLISHING**
**PROCEDURES FOR DETERMINING REQUESTS FOR ADEQUATE ASSURANCE OF**
**PAYMENT; (IV) AUTHORIZING CERTAIN FEE PAYMENTS; (V) REQUIRING**
**UTILITY PROVIDERS TO RETURN DEPOSITS FOR UTILITY SERVICES NO**
**LONGER IN USE; AND (VI) GRANTING RELATED RELIEF**

American Electric Power ("AEP"), Arizona Public Service Company ("APS"),

CenterPoint Energy Services, Inc. ("CES"), Commonwealth Edison Company ("ComEd"),

Constellation NewEnergy, Inc. ("CNE"), Constellation NewEnergy – Gas Division, LLC

("CNEG"), Constellation Energy Gas Choice, LLC ("CEGC"), Evergy, Inc. ("Evergy"), Florida

Power & Light Company ("FPL"), Georgia Power Company ("Georgia Power"), Metropolitan

Edison Company ("Met-Ed"), Monongahela Power Company ("Mon Power"), Ohio Edison

Company ("OE"), Potomac Edison Company ("PE") and Virginia Electric, Power Company d/b/a

Dominion Energy Virginia ("DEV"), Gulf Power Company ("Gulf Power") and The Potomac

Electric Power Company ("Pepco") (collectively, the "Utilities"), hereby object to the *Motion of*

*Debtors For Interim and Final Orders (I) Determining Adequate Assurance of Payment For Future Utility Services; (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services; (III) Establishing Procedures For Determining Requests For Adequate Assurance of Payment; (IV) Authorizing Certain Fee Payments; (V) Requiring Utility Providers To Return Deposits For Utility Services No Longer In Use; and (VI) Granting Related Relief* (the "Utility Motion") (Docket No. 10), and set forth the following:

### Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

The Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $1,328,529.24 that supposedly reflects approximately one-half of the Debtors' average monthly utility charges, excluding utility charges billed directly to the Debtors' landlords, existing deposits and surety bonds (the "Bank Account"). The Court should reject the Debtors' proposed Bank Account because: (1) Outside of bankruptcy courts that ignore the plain language of Section 366, this "form" of security is not a recognized form of security by any public utility commission, (2) The Utilities bill the Debtors on a monthly basis and provide the Debtors with generous payment terms pursuant to applicable state law, tariffs, regulations or contract, and a two-week account is not sufficient in amount or in form to provide the Utilities with adequate assurance of payment; (3) Section 366(c) of the

2

Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account; and (4) Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities, the Court should reject it as an insufficient form of adequate assurance of payment for the reasons set forth in Section A.1. of this Objection.

The Utilities are seeking the following cash deposits from the Debtors, which are amounts that they are authorized to obtain pursuant to applicable state law or contract: (a) AEP - $107,158 (2-month); (b) APS - $30,270 (2.5-month); (c) CES - $77,000 (2-month); (d) ComEd - $18,810 (2-month); (e) CNE - $117,401 (2-month); (f) CNEG - $22,767 (2-month); (g) CEGC - $7,635 (2-month; (h) Evergy - $80,910 (2-month); (i) FPL - $29,800 (2-month); (j) Georgia Power - $33,420 (2-month); (k) Met-Ed - $2,980 (2-month); (l) Mon Power - $10,022(2-month); (m) OE - $7,936 (2-month); (n) PE - $8,714 (2-month); (o) DEV - $40,648 (2-month); (p) Gulf Power - $11,568; and (q) Pepco - $21,970 (2-month). Based on all the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-petition deposit requests are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.      On March 3, 2020 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.      The Debtors' chapter 11 bankruptcy cases are being jointly administered.

3

**The Utility Motion**

3.      On the Petition Date, the Debtors filed the Utility Motion.

4.      Because the Utilities were not properly or timely served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, the Utilities had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on March 4, 2020, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" to the Utilities.

5.      On March 4, 2020, the Court entered the *Interim Order (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment For Future Utility Services, (III) Establishing Procedures For Determining Adequate Assurance of Payment, and (IV) Granting Related Relief* (the "Interim Utility Order")(Docket No. 72). The Interim Utility Order set (i) an objection deadline of March 23, 2020 and (ii) the final hearing on the Utility Motion to take place on April 3, 2020 at 10:00 a.m.

6.      Through the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is the Bank Account containing $1,328,529.24 that supposedly reflects approximately one-half of the Debtors' average monthly utility charges, excluding utility charges billed directly to the Debtors' landlords, existing deposits and surety bonds.  Utility Motion at ¶ 10.  Reducing the monies contained in the Bank Account by the amounts of alleged prepetition deposits or a surety bond does not make sense because the

Debtors do not know if: (i) any cash deposits held by a Utility will remain after a utility exercises its right under Section 366(c)(4) of the Bankruptcy Code to recoup prepetition security against prepetition debt; or (ii) a balance will remain on a surety bond after payment of prepetition debt.

7.      It is not clear from the Utility Motion or the Interim Utility Order, however, what specific amounts, if any, are included in the Bank Account for the Utilities because there are no amounts identified in the pleadings or any exhibits thereto.

8.      The proposed Bank Account is not acceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment.  Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

9.      The Debtors seek Court approval that the amount contained in the Bank Account attributable to each utility provider will be returned to the Debtors within ten (10) business days of the earlier of (i) reconciliation and payment by the Debtors of a final invoice following termination of utility services, and (ii) the effective date of any Chapter 11 confirmed plan.  As the Utilities bill the Debtors in arrears, and the Utilities would likely provide post-petition utility goods/services to the Debtors through a sale closing date or the effective date of a plan, any monies contained in the Bank Account on behalf of the Utilities should not be returned to the Debtors until the Debtors confirm that they have paid in full their post-petition utility expenses owed to the Utilities.  Utility Motion at ¶ 21(j).

10.      The Utility Motion does not address why the Bank Account would be underfunded with only two-weeks of utility charges when the Debtors know that the Utilities are required by

applicable state laws, regulations, tariffs or contract to bill the Debtors monthly. Moreover, presumably the Debtors want the Utilities to continue to bill them monthly and provide them with the same generous payment terms that they received prepetition. Accordingly, if the Bank Account is relevant, which the Utilities dispute, the Debtors need to explain: (A) why they are only proposing to deposit two-week amounts into the Bank Account for the Utilities; and (B) how such an insufficient amount could even begin to constitute adequate assurance of payment for the Utilities' monthly bills.

11.     Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2). Rather, without providing any specifics, the Utility Motion merely states that the Bank Account, "in conjunction with the Debtors' ability to pay for future utility services in accordance with their prepetition practices," constitutes sufficient adequate assurance of payment. Utility Motion at ¶ 20.

### The Debtors' Financing Motion

12.     On the Petition Date, the Debtors filed the *Motion of Debtors For Interim and Final Orders (I) Authorizing the Debtors To Obtain Senior Secured Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection To Prepetition Secured Parties; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Financing Motion")(Docket No. 11).

13.     Through the Financing Motion, the Debtors seek authority to enter into a new money credit facility not to exceed $23 million, and a roll up loan facility not to exceed $115

6

million.  Financing Motion at page 15.

14.     Through the Financing Motion, the Debtors also seek the approval of a carve-out for the payment of fees of the Debtors' professionals incurred prior to a Carve-Out Trigger Notice, plus an additional $250,000 following delivery of a Carve-Out Trigger Notice (the "Carve-Out").  Financing Motion at pages 18-19.

15.     The DIP Facility has the following Sale Milestones:  (i) no later than 30 days after the Petition Date – entry of Bid Procedures Order; (ii) no later than 75 days after the Petition Date – completion of auction; (iii) no later than 80 days after the Petition Date – entry of Sale Order; and (iv) no later than 90 days after the Petition Date – consummation of sale.  Financing Motion at pages 20-21.

16.     On March 5, 2020, the Court entered the *Interim Order (I) Authorizing the Debtors To Obtain Senior Secured Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection To Prepetition Secured Parties; (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "Interim Financing Order")(Docket No. 79).

17.     The Interim Financing Order approved the Carve-Out.  Interim Financing Order at pages 46-47.

18.     The Interim Financing Order also approved a wind-down reserve in the amount of $500,000 (inclusive of the Carve-Out) to be used by the Debtors for the purposes of administering their Chapter 11 cases and confirming a Chapter 11 Plan or liquidation, provided that the funding of such wind-down reserve is conditioned on the consummation of the sale of substantially all of the Debtors' assets.  Interim Financing Order at page 46.

ME1 32891458v.1

19.     Attached as Exhibit "2" to the Interim Financing Order is a 131-week budget through the week ending May 31, 2020 (the "Budget").  It is unclear whether the Debtors have budgeted sufficient sums for the timely payment of their post-petition utility expenses.

## The Sale Motion

20.     On the Petition Date, the Debtors filed the *Combined Motions of the Debtors For Orders: (I)(A) Approving Bid Procedures In Connection With Sale of the Debtors' Assets; (B) Scheduling Auction and Hearing To Consider Approval of Sale; (C) Approving Procedures Related To Assumption of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notices; and (E) Granting Related Relief; and (II)(A) Authorizing Sale of the Debtors' Assets, Free and Clear of All Liens, Claims, Interests, and Encumbrances; (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief* (the "Sale Motion")(Docket No. 19).

21.     The Debtors entered into a Stalking Horse Agreement with DBFLF CFTWE Holdings, L.P., an affiliate of Fortress Credit Co LLC.  Sale Motion at page 8.

22.     The Debtors' propose the following timeline to conduct the sale process and auction: (i) April 1, 2020 – hearing on Sale Motion; (ii) April 24, 2020 – assumption and assignment notice service deadline; (iii) May 15, 2020 – sale objection deadline, cure/assignment objection deadline, adequate assurance objection deadline, and bid deadline; (iv) May 19, 2020 – auction; (v) May 20, 2020 – assignment notice service deadline; (vi) May 22, 2020 – sale hearing; and (vii) June 1, 2020 – sale closing date.  Sale Motion at ¶ 22.

## The Lease Rejection Motions

23.     On the Petition Date, the Debtors filed the *Motion of Debtors For An Omnibus Order*

*(I) Authorizing and Approving (A) Rejection of Certain Unexpired Leases Upon the Surrender Date and (B) Procedures For the Sale or Abandonment of De Minimis Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (II) Granting Related Relief* (the "First Lease Rejection Motion")(Docket No. 16).

24.     Pursuant to the First Lease Rejection Motion, the Debtors are seeking authority to reject certain leases as of March 31, 2020. First Lease Rejection Motion at ¶ 35.

25.     On the Petition Date, the Debtors filed the *Motion of Debtors for an Omnibus Order (I) Authorizing (A) the Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, If Any, Each Effective Nunc Pro Tunc to the Petition Date; and (II) Granting Related Relief* (the "Second Lease Rejection Motion")(Docket No. 18).

26.     Pursuant to the Second Lease Rejection Motion, the Debtors are seeking authority to reject certain leases, effective *nunc pro tunc* to the Petition Date.  Second Lease Rejection Motion at ¶ 1.

27.     On March 13, 2020, Debtors' counsel, by email, confirmed that although the Debtors seek authority to reject certain leases as of the Petition Date pursuant to the Second Lease Rejection Motion, the Debtors will still require utility service at the rejected lease locations until March 31, 2020 to remove fixtures and equipment.

### Facts Concerning CNE

28.     CNE provides electricity and related services to Debtor Logan's Roadhouse, Inc. ("Logan's") pursuant to a Master Retail Electricity Supply Agreement and related Fixed Price Solutions Transaction Confirmation (collectively, the "Electricity Agreement"), that sets forth the terms and conditions concerning CNE's provision of electricity and related services to Logan's.

ME1 32891458v.1

CNE has continued to provide Logan's with electricity and related services pursuant to the Electricity Agreement since the Petition Date.

29.     Pursuant to the Electricity Agreement, Logan's receives approximately one month of electricity and related services before CNE issues a bill.  Once a bill is issued, Logan's has 20 days to pay the bill.  If Logan's fails to timely pay a bill, a late fee may be subsequently imposed on the account.  Accordingly, Logan's could receive approximately two months of electricity and related services before CNE could terminate the Electricity Agreement after a post-petition payment default.

30.     The estimated pre-petition debt owed by Logan's to CNE is approximately $63,100.  CNE is requesting a two-month cash deposit of $117,401 as adequate assurance of payment from Logan's, which is an amount it can obtain from Logan's pursuant to the terms and conditions of the Electricity Agreement.

### Facts Regarding CNEG

31.     CNEG provides natural gas and related services to Debtor CraftWorks Restaurants & Breweries, Inc. ("CraftWorks")and to Logan's pursuant to multiple Base Contracts for Sale and Purchase of Natural Gas and multiple related Transaction Confirmations (collectively, the "CNEG Gas Agreements") that set forth the terms and conditions concerning CNEG's provision of natural gas and related services to CraftWorks and Logan's.  CNEG has continued to provide CraftWorks and Logan's with natural gas and related services pursuant to the CNEG Gas Agreements since the Petition Date.

32.     Pursuant to the CNEG Gas Agreements, CraftWorks and Logan's receive approximately one month of natural gas and related services before CNEG issues a bill.  Once a

10

bill is issued, CraftWorks and Logan's have 15 days to pay the applicable bill.  If CraftWorks or Logan's fail to timely pay a bill, a late fee may be subsequently imposed on the account. Accordingly, CraftWorks and Logan's could receive approximately two months of natural gas and related services before CNEG could terminate the CNEG Gas Agreements after a post-petition payment default.

33.    The estimated pre-petition debt owed by CraftWorks and Logan's to CNEG is approximately $31,100.  CNEG is requesting a two-month cash deposit of $22,767 as adequate assurance of payment from CraftWorks and Logan's, which is an amount it can obtain from CraftWorks and Logan's pursuant to the terms and conditions of the CNEG Gas Agreements.

## Facts Concerning CEGC

34.    CEGC provides natural gas and related services to CraftWorks pursuant to a contract to supply natural gas to several CraftWorks locations in Illinois (the "CEGC Gas Agreement").  CEGC has continued to provide CraftWorks with natural gas pursuant to the CEGC Gas Agreement since the Petition Date.

35.    Under the CEGC Gas Agreement, CraftWorks receives approximately one month of natural gas supply before CEGC issues a bill.  Once a bill is issued, CraftWorks must timely pay the bill.  If Craftworks fails to timely pay the bill, CEGC must provide CraftWorks with a 15 day written notice before CraftWorks will be in default under the CEGC Gas Agreement. Accordingly, CraftWorks could receive approximately two months of natural gas supply before CEGC could terminate the CEGC Gas Agreement for a post-petition payment default.

36.    The estimated pre-petition debt owed by CraftWorks to CEGC is approximately $11,600.  CEGC is seeking a two-month deposit of $7,635 as adequate assurance of payment

11

from CraftWorks, which is an amount it can obtain from Craftworks pursuant to the terms and conditions of the CEGC Gas Agreement

### Facts Concerning CES

37.     CES provides natural gas and related services to the Debtors pursuant to the Base Contract for Sale and Purchase of Natural Gas and related Transaction Confirmation (collectively, the "Gas Agreement") that set forth the terms and conditions concerning CES's provision of natural gas and related services to the Debtors.  CES has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreements since the Petition Date.

38.     Under the billing cycle set forth in the Gas Agreement, the Debtors receive approximately one month of utility goods and/or services before CES issues an invoice for such charges.  Once a bill is issued, the Debtors have 10 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a late charge may be imposed.  The Gas Agreement may be terminated if certain events of default occur.  Accordingly, under the billing cycle set forth in the Gas Agreement, the Debtors could receive approximately two months of unpaid charges before CES could cease the supply of natural gas and related services for a post-petition payment default.

39.     The estimated pre-petition debt owed by the Debtors to CES is approximately $53,251.94.  CES is seeking a two-month deposit of $77,000 as adequate assurance of payment pursuant to Section 366(c) of the Bankruptcy Code.

### Facts Concerning the Utilities Other Than CNE, CNEG, CEGC and CES

40.     Each of the Utilities provided the Debtors with prepetition utility goods and/or services and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

12

ME1 32891458v.1

41.     Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account.  If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or its service will be disconnected.  Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

42.     In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to their tariffs and/or state laws, regulations and/or ordinances are set forth in Exhibit "A" attached hereto.

43.     Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified or the Debtors return to the Utilities for commodity supply, the Utilities' post-petition deposit requests are as follows:

13

| **Utility** | **No. of Accts.** | **Est. Prepet. Debt** | **Dep. Request** |
|---|---|---|---|
| AEP | 12 | $51,242.79 | $107,158 (2-month) |
| APS | 2 | $243.86 | $30,270 (2.5-month) |
| ComEd | 7 | $5,730.12 | $18,810 (2-month) |
| Evergy | 6 | $17,623.51 | $80,910 (2-month) |
| FPL | | Not yet available | $29,600 (2-month) |
| Georgia Power | 3 | $17,363.82 | $33,420 (2-month) |
| Met-Ed | 2 | $1,213.91 | $2,980 (2-month) |
| Mon Power | 1 | $5,516.87 | $10,022 (2-month) |
| OE | 1 | $4,731.31 | $7,936 (2-month) |
| PE | 1 | $5,536.34 | $8,714 (2-month) |
| DEV | 5 | $24,388.11 | $40,648 (2-month) |
| Gulf Power | 1 | $4,421.53 | $11,568 (2-month) |
| Pepco | 4 | $23,012.60 | $21,970 (2-month) |

44.     AEP holds prepetition cash deposits totaling $16,164.69 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  None of the prepetition cash deposit will remain after recoupment.

45.     Evergy holds prepetition cash deposits totaling $15,510.38 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  None of the prepetition    cash    deposit    will    remain    after    recoupment.

14

46.     Georgia Power held prepetition cash deposits totaling $35,786.28 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any remaining deposit after recoupment can be applied to Georgia Power's post-petition deposit request.

47.     FPL held prepetition cash deposits totaling $22,472 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any remaining deposit after recoupment can be applied to FPL's post-petition deposit request.

48.     Pepco held prepetition cash deposits totaling $13,550 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  None of the prepetition cash deposit will remain after recoupment.

**Discussion**

## A.      THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)).

*Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner.").  A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition.  *In re* Lucre, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005).  If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors.  Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

> 1.    **The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

ME1 32891458v.1

1. Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities. Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

2. It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have received approximately 60 days of commodity or service.

3. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts and what amounts, if any, are in the Bank Account for each Utility to draw upon.

4. The Debtors are not required to replenish the Bank Account following pay-outs.

5. The Debtors should not reduce the amount of Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full.

Accordingly, the Court should not approve the Bank Account as adequate assurance as to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

      2.    **The Utility Motion Should Be Denied As To The Utilities Because The Debtors Have No Set Forth Any Basis For Modifying The Utilities' Request Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amounts of the Utilities' requests for adequate assurance of payment. Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified. *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof). However, the Debtors do not provide the

17

Court with any evidence or factually supported documentation to explain why the amounts of the Utilities' adequate assurance requests should be modified.  Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i)   a cash deposit;
> (ii)  a letter of credit;
> (iii) a certificate of deposit;
> (iv)  a surety bond;
> (v)   a prepayment of utility consumption; or
> (vi)  another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services.  *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986).  In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the

ME1 32891458v.1

utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month.  The Utilities then provide the Debtors with approximately 10 to 30 days to pay a bill before a late fee may be charged, and also provide written notice before utility service can be terminated for non-payment pursuant to applicable state laws, tariffs and/or contracts.  Based on the foregoing state-mandated and contract-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of approximately 45 to 60 days based on their billing cycles.  Furthermore, the amounts of the Utilities' deposit requests are the amounts that the applicable public service commission, which is a neutral third-party entity, or applicable contract, permit the Utilities to request from their customers.  The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law or contract are binding on this Court, but, instead are introducing those amounts as evidence of amounts that their regulatory entities or contracts permit the Utilities to request from their customers.

Moreover, in contrast to the improper treatment proposed to the Debtors' Utilities, the Debtors have made certain that post-petition professionals are favored creditors over the Utilities by ensuring that the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default on the use of DIP financing, by seeking a $250,000 professionals carve-out

19

for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default.

Furthermore, as set forth in paragraph 27 above, Debtors' counsel confirmed that although the Debtors seek authority to reject certain leases as of the Petition Date pursuant to the Second Lease Rejection Motion, the Debtors will still require utility service at the rejected lease locations until March 31, 2020 to remove fixtures and equipment.

Therefore, despite the fact that the Utilities continue to provide the Debtors with crucial post-petition utility services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.      Denying the Utility Motion as to the Utilities;

2.      Awarding the Utilities the post-petition adequate assurance of payments pursuant to Section 366 in the amount and form satisfactory to the Utilities, which is the form and amount requested herein; and

3.      Providing such other and further relief as the Court deems just and appropriate.

ME1 32891458v.1

Dated: March 18, 2020        McCARTER & ENGLISH, LLP

/s/ *Shannon D. Humiston*
William F. Taylor, Jr. (#2936)
Kate R. Buck (DE#5140)
Shannon D. Humiston (DE#5740)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE  19801
Telephone: (302) 984-6300
Facsimile: (302) 984-6399
E-mail: wtaylor@mccarter.com
E-mail: kbuck@mccarter.com
E-mail: shumiston@mccarter.com

and

LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862
E-mail: russell@russelljohnsonlawfirm.com
        john@russelljohnsonlawfirm.com

*Counsel for American Electric Power, Arizona Public
Service Company, CenterPoint Energy Services, Inc.,
Commonwealth Edison Company, Constellation
NewEnergy, Inc., Constellation NewEnergy – Gas Division,
LLC, Constellation Energy Gas Choice, LLC, Evergy, Inc.,
Florida Power & Light Company, Georgia Power
Company, Metropolitan Edison Company, Monongahela
Power Company, Ohio Edison Company, Potomac Edison
Company and Virginia Electric, Power Company d/b/a
Dominion Energy Virginia, Gulf Power Company and The
Potomac Electric Power Company*