# EXHIBIT "A"



FILED

2020 SEP 10  PM 3:50

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

## PROFESSIONAL SERVICES AGREEMENT

**THIS AGREEMENT** is made and entered into this 1ˢᵗ day of April 2018 ("Effective Date"), by and between Logan's Roadhouse, Inc., ("COMPANY"), and PIPER JORDAN, LLC, a Nevada limited liability company ("CONSULTANT").

**RECITALS:**

A. **WHEREAS, COMPANY** seeks to have CONSULTANT perform certain services, which are described herein and described in Exhibit "A" hereto; and

B. **WHEREAS, CONSULTANT** represents that it has the expertise necessary to perform said services and holds all necessary licenses to practice and perform the services contemplated herein; and

C. **WHEREAS, COMPANY** and **CONSULTANT** desire to contract for professional services as described in the Scope of Services, attached hereto as Exhibit "A".

**NOW, THEREFORE,** for and in consideration of the mutual covenants and conditions contained herein, the parties hereby agree as follows:

**1.0    SERVICES PROVIDED BY CONSULTANT**

1.1    <u>Scope of Services.</u>    For the compensation set forth in Exhibit A hereto, CONSULTANT shall provide the professional services described in the Scope of Services attached hereto as Exhibit "A" and incorporated herein by this reference ("Services"). If a conflict arises between the Scope of Services document and this Professional Services Agreement (hereinafter "Agreement"), the terms of the Agreement shall govern.

1.2    <u>Professional Practices.</u>    All Services to be provided by CONSULTANT pursuant to this Agreement shall be provided by skilled personnel and in a manner consistent with the standards of care, diligence and skill ordinarily exercised by professionals in similar fields and circumstances in accordance with sound business practices. CONSULTANT warrants that it is familiar with the laws that may affect its performance of this Agreement and shall advise COMPANY of any changes in said laws within 48 hours that may affect CONSULTANT's performance under this Agreement if the CONSULTANT has actual knowledge or has reason to know of such changes. CONSULTANT and the COMPANY each represent that no COMPANY employee will provide any Services under this Agreement, but it is agreed that, to the extent necessary, one or more COMPANY representatives will provide all necessary information and assistance to CONSULTANT in order to allow CONSULTANT to perform the Services.

1.3    <u>Warranty.</u> CONSULTANT warrants that it shall perform the Services required by this Agreement in compliance with all applicable laws including, but not limited to, those laws related to minimum hours and wages; occupational health and safety; fair employment and employment practices; workers' compensation insurance; safety in

employment; and all other Federal, State and local laws and ordinances applicable to the services performed by CONSULTANT under this Agreement. Further, CONSULTANT shall indemnify and hold harmless COMPANY from and against all claims, demands, payments, suits, actions, proceedings and judgments of every nature and description, including reasonable attorney's fees and costs, arising from or relating to CONSULTANT's violation of any applicable law.

1.4    Delegation and Assignment. This is a personal service contract, and the duties set forth herein shall not be delegated or assigned to any other entity without the prior written consent of COMPANY, which consent shall not be unreasonably withheld or delayed. CONSULTANT may engage subcontractors or consultants to assist it in performing any and all services under this Agreement as permitted by law and may employ other personnel to perform services contemplated by this Agreement at CONSULTANT's sole cost and expense.

1.5    Microsite Ownership.  To the extent that CONSULANT performs Communication Services for COMPANY that include any Microsite, such Microsite shall be owned by CONSULTANT at all times and shall be the property of CONSULTANT upon termination of this Agreement.

1.6    Conflicts of Interest. During the term of this Agreement, CONSULTANT shall at all times maintain a duty of loyalty as to the COMPANY and shall not accept payment from or employment with any person or entity which will constitute a conflict of interest with the COMPANY.

1.7    Non-Exclusive Agreement. COMPANY acknowledges that CONSULTANT has entered into agreements with other companies for services similar to the Services that are subject to this Agreement and may enter into agreements with other companies for services similar to the Services that are subject to this Agreement as long as the said services do not interfere with the services performed by CONSULTANT for the COMPANY.

1.8    Non-discrimination. In performing this Agreement, CONSULTANT shall not engage in, nor permit its officers, employees or agents to engage in, discrimination in employment of persons on the basis of a person's legally protected trait, including, but not limited to race, religion, color, national origin, ancestry, age, mental or physical disability, medical condition, marital status, sexual gender or sexual orientation, except as permitted pursuant to Federal law.

1.9    CONSULTANT Business Certificate. CONSULTANT shall obtain and maintain during the term of this Agreement any and all licenses, permits, qualifications, insurance and approvals of whatever nature that are legally required of CONSULTANT to practice its profession, skill or business.

## 2.0    COMPENSATION AND BILLING

2.1    Compensation. Except as otherwise provided herein, CONSULTANT compensation shall be as set forth in Exhibit "A".

2.2    <u>Additional Services.</u> CONSULTANT shall not be entitled to additional compensation for any services provided outside the scope of services specified in the Exhibit "A" unless the COMPANY, prior to CONSULTANT performing the additional services, approves such additional services and the associated fee for those additional services in writing.  It is specifically understood that oral requests and/or approvals of such additional services or additional compensation shall be barred and are unenforceable by either party.

2.3    <u>Method of Billing.</u> From the Effective Date through December 31, 2018, the parties agree that CONSULTANT shall not submit invoices to the COMPANY for the services set forth in Exhibit "A" hereto.  The parties agree that CONSULTANT shall be entitled to all fees and commissions set forth in Exhibit "A" hereto, which shall be paid by the vendor(s).  To the extent that the COMPANY desires additional services that are approved and performed by CONSULTANT and that the parties agree shall be paid by the COMPANY, then, on a monthly basis, CONSULTANT shall submit invoices to COMPANY for payment. Said invoice shall reflect CONSULTANT's services that have been performed in accordance with the terms of this Agreement during the period covered by such invoice. COMPANY shall pay CONSULTANT's invoice within thirty (30) days from the date COMPANY receives said invoice. The invoice shall describe in detail, the services performed and the associated time for completion.

For the period of January 1, 2019 through December 31, 2020, with respect to any and all commissions paid by vendors for Core Benefits as set forth in 6(A) of Exhibit A ("<u>Core Commissions</u>"), CONSULTANT is entitled to the first $215,000 in Core Commissions that are earned during each annual Policy Period. The current Policy Period starts on January 1st each year and continues through December 31st each year. Any Core Commissions paid by vendors above $215,000 during a Policy Period shall not be earned by CONSULTANT. Instead, any Core Commissions that are paid in excess of $215,000 shall be a COMPANY allowance that may be used by the COMPANY in any manner that does not violate ERISA. The COMPANY understands that CONSULTANT cannot directly pay any allowance amount from Core Commissions to the COMPANY due to ERISA restrictions.  Moreover, it is agreed that if Core Commissions earned during the Policy Period are less than $215,000, then the COMPANY shall pay to CONSULTANT the difference between paid Core Commissions and $215,000.

With respect to any and all commissions paid by vendors for Enhanced Benefits as set forth in 6(B) above ("<u>Enhanced Commissions</u>"), CONSULTANT is entitled to 100% of all Enhanced Commissions.  Any earned Enhanced Commissions shall not be deemed as an offset to earned Core Commissions that are less than $215,000 during a Policy Period.

Core Commission reconciliation shall occur on or before April 1 following the Policy Period. Should CONSULTANT earn less than $215,000 in Core Commissions during the Policy Period, the COMPANY shall pay CONSULTANT the difference between

Core Commissions actually received by CONSULTANT and $215,000, which shall be paid on or before on or before April 30 following the Policy Period.

Moreover, the COMPANY shall reimburse CONSULTANT for all reasonable, out-of-pocket travel-related costs pre-approved by COMPANY and incurred by CONSULTANT for Open Enrollment and new hire on-boarding meetings ("Reimbursable Travel Costs"). The Reimbursable Travel Costs will be kept to a reasonable minimum (e.g., coach fares, midrange hotels such as Doubletree, etc.). CONSULTANT shall include Reimbursable Travel Costs in the annual Core Commission reconciliation process. Except for Reimbursable Travel Costs, the COMPANY shall not be responsible for any other costs incurred by the CONSULTANT, travel or otherwise, unless otherwise agreed to in writing as set forth in Section 2.3 above.

2.4     Records and Audits. Records of CONSULTANT's services directly relating to this Agreement shall be maintained by the CONSULTANT and shall be made available to COMPANY for inspection and/or audit at mutually convenient times for a period of three (3) years from the Effective Date. Any such inspection shall be conducted at the COMPANY's expense, during normal business hours and upon a minimum of 14 (fourteen) days written notice to CONSULTANT. Such audit shall also be subject to the execution of a confidentiality agreement regarding inadvertent access to confidential information not related to the COMPANY.

## 3.0     CONFIDENTIALITY

3.1     Confidential Information

Consultant agrees at all times during the term of, or after termination of, this Agreement, to hold in strictest confidence, and not to use, except for Consultant's obligations to the Company under this Agreement, or to disclose to any person, firm, corporation or other entity without written authorization of the Company, any Confidential Information of the Company that Consultant obtains.

The term "Confidential Information" means any and all oral or written (including electronically recorded) confidential technical and/or business information including, but not limited to, information related to, or contained in, patents, patent applications, presentations, emails, research, product plans, products, developments, recipes, inventions, trade secrets, know-how, processes, designs, drawings, engineering, formulae, markets, software (including source and object code), computer programs, algorithms, business plans, agreements with third parties, licenses, services, customers, customer lists, suppliers, prices and costs, finances, budgets, marketing or other business and technical information disclosed to Consultant or Contractor by the other party during the term of the Agreement, whether or not during working hours. Confidential Information does not include any information that was in the public domain at the time it was disclosed by the Company or entered the public domain through no wrongful act of the recipient or of others who were under confidentiality obligations as to the item or items involved.

4819-6060-6568.2
4

At the time of termination of this Agreement, Consultant will deliver to the Company or destroy (and will not keep in Consultant's possession, recreate or deliver to anyone else) all Company property and documents (either electronic copies or hard copies), including, but not limited to, documents containing confidential information, presentations, records, data, notes, reports, recipes, proposals, lists, correspondence, specifications, drawings, sketches, laboratory notebooks, or flow charts developed by Consultant pursuant to this Agreement or otherwise belonging to the Company. At the request of Company, Consultant shall certify in writing that all documents have been so returned or destroyed.

3.2   All documents prepared by CONSULTANT in its performance of this Agreement including, but not limited to, analysis of COMPANY data, shall be considered COMPANY property and will be provided to the COMPANY in accordance with the terms of this Agreement. All information obtained by the COMPANY from the CONSULTANT or its direct or indirect affiliates and their respective businesses and products and all information prepared, directly or indirectly, by COMPANY or at COMPANY's request using any such CONSULTANT information (including documentation prepared by CONSULTANT or its direct or indirect affiliates based on information provided by COMPANY) is owned by CONSULTANT and is confidential and proprietary to the CONSULTANT ("Confidential Information"). The COMPANY will not use, disseminate or in any way, or disclose CONSULTANT's Confidential Information for any purpose to any person or entity, except for the sole purpose of COMPANY's participation in the services provided by CONSULTANT. The COMPANY agrees that it will take all necessary steps to maintain the confidentiality of CONSULTANT's Confidential Information (including those steps that the COMPANY takes to protect its own information that it regards as confidential).   Under no circumstances shall the COMPANY disclose any CONSULTANT Confidential Information to any person or entity without express written authorization from CONSULTANT. CONSULTANT retains exclusive ownership of, and all right, title and interest in and to, it's Confidential Information, and does not grant or transfer any right or license to the COMPANY, except as set out in this Agreement. "Confidential Information" does not include information that the COMPANY can demonstrate is or becomes generally available to the public other than as a result of a disclosure by COMPANY or its employees, agents, consultants or third parties ("Representatives").

3.3   COMPANY will ensure that none of its Representatives will disclose any Confidential Information except for the sole purpose of COMPANY's participation in the services provided by CONSULTANT.

3.4   COMPANY will advise each of its Representatives receiving Confidential Information of the confidential nature of such information and COMPANY's obligations under this Agreement.

3.5   If COMPANY or any of its Representatives is required by law to disclose any Confidential Information, COMPANY shall give CONSULTANT as much advance notice as is possible of any such requirement so that CONSULTANT may seek a protective order or other appropriate remedy and/or waive compliance with this

section. If, in the absence of a protective order or other remedy or the receipt of a waiver by CONSULTANT, COMPANY or any of its Representatives are nonetheless, legally compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt or suffer other censure or penalty, COMPANY or its Representatives may, without liability under this Agreement, disclose Confidential Information, provided that COMPANY exercise its best efforts to preserve the confidentiality of the Confidential Information.

3.6     At the time of termination of this Agreement, COMPANY will deliver to the CONSULTANT or destroy (and will not keep in COMPANY's possession, recreate or deliver to anyone else) all CONSULTANT property and documents (either electronic copies or hard copies), including, but not limited to, documents containing confidential information, presentations, records, data, notes, reports, recipes, proposals, lists, correspondence, specifications, drawings, .sketches, laboratory notebooks, or flow charts developed by COMPANY pursuant to this Agreement or otherwise belonging to the CONSULTANT, together with all copies and summaries thereof. At the request of CONSULTANT, COMPANY shall certify in writing that all documents have been so returned or destroyed.

## 4.0     TERM AND NOTIFICATION

4.1     This Agreement shall be effective as of the Effective Date and shall continue for 33 months (Initial Period). At the end of this 33 month Initial Period, the parties must agree, in writing, to extend it for an additional period of time.

4.2     In the event that any party commits a material breach of this Agreement, the other party may terminate this Agreement upon written notice so long as: (i) it first provides the breaching party with written notice of such material breach; and (ii) the breaching party fails to cure the material breach within 30 days after receipt of the written notice of said material breach.

4.3     In the event either party makes a general assignment for the benefit of creditors, becomes insolvent or becomes subject to an involuntary or voluntary bankruptcy proceeding, receivership or liquidation, the other party may terminate this Agreement upon written notice.

4.4     In the event of termination pursuant to parts 4.2 and 4.3, CONSULTANT shall be paid the reasonable value of Services rendered to the date of termination.

4.5     CONSULTANT shall determine the amount of payments due, if any, under part 4.4 as applicable in accordance with its books and records (which determination shall be binding on COMPANY) and notify COMPANY of the applicable amount which shall be due on receipt of that notice.

## 5.0     INSURANCE

5.1     Scope and Limits of Insurance. CONSULTANT shall obtain and maintain during the term of this Agreement all of the following insurance coverages:

4819-6060-6568.2

6

(a)  Commercial general liability, including premises-operations, products/completed operations, broad form property damage, blanket contractual liability, independent contractors, personal injury with a policy limit of Two Million Dollars ($2,000,000.00) per occurrence and Four Million Dollars ($4,000,000.00) per aggregate.

(b)  Professional liability, with a policy limit of One Million Dollars ($1,000,000.00) per claim and aggregate.

(c)  Workers' compensation insurance as required by the State of California.

5.2  Certificates of Insurance. If requested by the COMPANY, CONSULTANT shall provide to COMPANY certificates of insurance showing the insurance coverages and required endorsement described above, prior to performing any services under this Agreement.

5.3  Notice of Cancellation. CONSULTANT shall provide the COMPANY thirty (30) days prior written notice of cancellation of or a material change in any of the required insurance coverages set forth in this Agreement or Exhibit "A" hereto.

6.0  LIMITATION OF LIABILITY.

6.1  TO THE FULL EXTENT ALLOWED BY APPLICABLE LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE HEREUNDER, OR OTHERWISE FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT OR PUNITIVE DAMAGES EVEN IF THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  TO THE FULL EXTENT ALLOWED BY APPLICABLE LAW, THE FOREGOING LIMITATIONS SHALL APPLY REGARDLESS OF THE FORM OF ACTION AND WHETHER BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTE, OR STRICT LIABILITY.

6.2  THE LIABILITY OF EITHER PARTY UNDER ALL CIRCUMSTANCES (WHETHER UNDER THIS AGREEMENT OR OTHERWISE) OVER THE ENTIRE TERM OF THIS AGREEMENT SHALL BE LIMITED TO THE SUM OF (i) ANY FEES PAID DIRECTLY BY COMPANY TO CONSULTANT AND (ii) THE AMOUNT OF COMMISSIONS RECEIVED BY CONSULTANT FROM CARRIER(S) WITH RESPECT TO THE COMPANY'S EMPLOYEES PARTICIPATING IN THE PROGRAM IN THE 3 MONTHS PRIOR TO THE FIRST ACT OR OCCURRENCE GIVING RISE TO THE LIABILITY.

6.3  THE LIMITATION OF LIABILITY SET FORTH IN THIS SECTION WILL NOT BE AFFECTED IF ANY REMEDY PROVIDED HEREIN SHALL FAIL OF ITS ESSENTIAL PURPOSE.  EACH OF THE PARTIES ACKNOWLEDGE THAT THE LIMITATION OF LIABILITY PROVISIONS SET FORTH IN THIS SECTION WAS A BARGAINED FOR ELEMENT OF THE CONTRACTUAL ARRANGEMENT BETWEEN THE PARTIES AND ABSENT THESE LIMITATION OF LIABILITY PROVISIONS NEITHER PARTY WOULD HAVE ENTERED INTO THIS AGREEMENT.

7.0  **GENERAL PROVISIONS**

7.1  Entire Agreement. This Agreement including all exhibits and other documents attached to or referenced in this Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and

supersedes all prior and contemporaneous agreements and understandings relative to such subject matter. All exhibits and attachments to this Agreement are incorporated by reference into this Agreement.

7.2   Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given and effective when delivered in person, by facsimile or email, receipt confirmed, or on the next business day when sent by overnight courier or on the second succeeding business day when sent by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the addresses set forth below (or at such other address for a party as shall be specified by like notice).

| IF TO CONSULTANT: | IF TO COMPANY: |
|---|---|
| Robyn Piper, Partner | Lisa Richter |
| Piper Jordan, LLC | Logan's Roadhouse |
| 12520 High Bluff Drive | 3011 Armory Drive |
| San Diego, CA 92130 | Nashville, TN 37204 |
| Telephone: (858) 350-1774 | Telephone: (615) 885-9056 |

7.3   Governing Law; Forum; Service of Process. This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee. This Agreement and its subject matter have substantial contacts with Tennessee, and all actions, suits, or other proceedings with respect to this Agreement shall be brought only in the United States District Court having jurisdiction over that County. In any such action, suit, or proceeding, such court shall have personal jurisdiction of all of the parties hereto, and service of process upon them under any applicable statutes, laws, and rules shall be deemed valid and good.

7.4   Attorney's Fees. In the event that litigation is brought by any party that is in any way connected with this Agreement, the prevailing party shall be entitled to recover from the opposing party all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party in the exercise of any of its rights or remedies hereunder or the enforcement of any of the terms, conditions, or provisions hereof.

7.5   Assignment. Without the express prior written consent of the other Party, neither Party shall assign or delegate any of its rights or obligations under this Agreement to a third party for any of its duties hereunder to be performed by any person not authorized by the other Party to perform the same. Any attempted assignment, transfer, subletting or encumbrance shall be void and shall constitute a material breach of this Agreement and cause for termination of this Agreement. Regardless of COMPANY's consent, no subletting or assignment shall release CONSULTANT or CONSULTANT's obligation to perform all other obligations to be performed by CONSULTANT hereunder for the term of this Agreement.

7.6   Successors in Interest. This Agreement, and the rights, obligations and responsibilities under this Agreement, will be for the benefit of the COMPANY'S successors in interest and will be binding upon any and all of the COMPANY'S successors in

interest, including but not limited to any successor who merges with the COMPANY, purchases the COMPANY or acquires a majority of the COMPANY'S assets.

7.7     Indemnifications and Hold Harmless.

(a)     CONSULTANT will indemnify, defend and hold harmless COMPANY and its officers, directors, representatives, subsidiaries, affiliates, assignees, franchisees, licensees and successors in interest and their respective agents against any loss, liability, cost or expense (including reasonable attorney's fees, costs and expenses) to the extent such loss, liability, cost or expense arises from any breach by CONSULTANT of any covenant, agreement, obligation, representation or warranty of CONSULTANT contained in this Agreement.

(b)     COMPANY will indemnify, defend and hold harmless CONSULTANT and its officers, directors, employees, representatives, subsidiaries, affiliates, assignees, franchisees, licensees and successors in interest and their respective agents against any loss, liability, cost or expense (including reasonable attorney's fees, costs and expenses) to the extent such loss, liability, cost or expense arises from any breach by COMPANY of any covenant, agreement, obligation, representation or warranty of COMPANY contained in this Agreement.

7.8     Independent Contractor. CONSULTANT is an independent contractor of COMPANY and this Agreement does not create any agency, joint venture or partnership between the parties. Neither party will impose or create any obligation or responsibility express or implied or make any, representations or warranties on behalf of the other, except as expressly provided herein.

7.9     Responsibility for Errors. CONSULTANT shall be responsible for its work and results under this Agreement. CONSULTANT, when requested, shall furnish clarification and/or explanation as may be required by the COMPANY's representative, regarding any services rendered under this Agreement at no additional cost to COMPANY. In the event that an error or omission attributable to CONSULTANT occurs, then CONSULTANT shall, at no cost to COMPANY, provide all other CONSULTANT professional services necessary to rectify and correct the matter to the sole satisfaction of COMPANY and to participate in any meeting required with regard to the correction. CONSULTANT will assume the information supplied by COMPANY, (or on its behalf by third parties) is accurate and complete. CONSULTANT's responsibilities (and associated compensation) do not include independent verification of required information. Problems with information quality and/or delays in providing such information may result in a delay in the performance of the Services or an increase in fees.     COMPANY shall be responsible for the information provided to CONSULTANT under this Agreement.

7.10    Prohibited Employment. CONSULTANT shall not employ any current employee of COMPANY to perform the work under this Agreement while Agreement is in effect.

However, CONSULTANT may work with COMPANY representatives in order to perform the services set forth in this Agreement.

7.11    Costs. Each party shall bear its own costs and fees incurred in the preparation and negotiation of this Agreement and in the performance of its obligations hereunder except as expressly provided herein.

7.12    Third Party Beneficiaries. All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the respective parties hereto.   Nothing express or implied in this Agreement will be construed to give any party other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement other than those set forth in paragraph 7.6.

7.13    Headings. Paragraphs and subparagraph headings contained in this Agreement are included solely for convenience and are not intended to modify, explain or to be a full or accurate description of the content thereof and shall not in any way affect the meaning or interpretation of this Agreement.

7.14    Amendments. No modification, amendment or waiver of any of the provisions of this Agreement shall be effective unless in writing specifically referring hereto, and signed by the parties hereto or their successors.

7.15    Waiver. The failure of any party to enforce any provision of this Agreement will not be construed as a waiver of such provision or of the right of any party hereafter to enforce any other provision or subsequent breach of such provision.

7.16    Severable. If any term, provision, covenant or restriction of this Agreement is to any extent held by a court or other tribunal to be invalid, void or unenforceable, all remaining provisions set forth herein shall remain in full force and effect, and shall, in no way, be affected, impaired or invalidated.  In addition, this Agreement will be construed and enforced as if this Agreement did not contain the particular term, provision, covenant or restriction held to be invalid, void or unenforceable.  Further, the parties agree that any such invalid, void or unenforceable term, provision, covenant or restriction shall be reformed, if possible, so as to be no longer invalid, void or unenforceable to the maximum extent permitted under applicable law.  The parties agree to cooperate to revise any term, provision, covenant or restriction of this Agreement held to be invalid, void or unenforceable.

7.17    Counterparts. This Agreement may be executed by the parties in separate counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which taken together shall constitute one and the same instrument.

7.18    Survival. Any termination, cancellation or expiration of this Agreement for any reason shall not release any party from any liability which, at the time of termination, cancellation or expiration, has already accrued or which thereafter may accrue in respect to any act or omission that took place prior to termination, cancellation or

expiration or from any obligation which by its nature is intended to survive termination, cancellation or expiration.

7.19   **Representation by Counsel; Interpretation.** The parties hereto each acknowledge that each party to this Agreement has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law, or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

7.20   <u>Section Headings</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of the Agreement. Each reference in this Agreement to a section, schedule or exhibit, unless otherwise indicated, shall mean a section, schedule or exhibit attached to this Agreement. For purposes of this Agreement "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term and "or", "either" and "any" are not exclusive.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the day and date first above shown.

LOGAN'S ROADHOUSE, INC.                    PIPER JORDAN LLC

_____            _____
Bill Streitberger, CPO                     Robyn Piper, Partner

4819-6060-6568.2

12

**Exhibit A**

Scope of Services
1. **Service Name:** Health & Benefits Consulting Services for COMPANY
2. **Objective:** Serve as CONSULTANT to COMPANY on COMPANY'S employer-sponsored health and welfare benefits (contributory, voluntary and non-contributory).
3. **Description of CONSULTANT Responsibilities:**

| | Service Description | Description included in Core Annual Budget ($700) | Description not included in Annual Budget (Y/N) | Description/Additional Hours |
|---|---|---|---|---|
| **1.0** | **STRATEGY AND PLANNING** | | | |
| 1.1 | Annual meeting to discuss program objectives, active employee cost trends, plan maximization and delivery, cost-saving interventions and alternate plan offerings, and overall Corporate and Total Rewards strategy. | Y | N | |
| 1.2 | Develop multi-year strategic and financial plan | Y | N | |
| 1.3 | Annual project plan in accordance with multi-year strategy | Y | N | |
| 1.4 | ACA analysis and strategy development including financial impact modeling, solution modeling, ongoing analysis and action planning, and leadership discussions | Y | N | |
| 1.5 | Annual measurement and review of outcomes compared to goals and objectives | Y | N | |
| 1.6 | Market and industry trends, including analysis of specific opportunities and subsequent impact | Y | N | |
| 1.7 | Annual planning meeting facilitation | Y | N | |
| 1.8 | Comprehensive team including specialty resources (pharmacy, clinical, absence management, and communications) | Y | N | |
| 1.9 | Annual renewal preparation and renewal negotiations | Y | N | |
| 1.10 | Drafting of Executive Committee and Benefits Committee presentations | Y | N | |
| 1.11 | Attendance at Executive Committee and Benefits Committee meetings | Y | N | |
| 1.12 | Peer benchmarking | Y | N | |
| 1.13 | Employee engagement strategies | Y | N | |
| **2.0** | **FINANCIAL ANALYSIS AND MONITORING** | | | |
| 2.1 | Annual action plan specific to Logan's Roadhouse | Y | N | |

| | | | | |
|---|---|---|---|---|
| 2.2 | Development of Financial / Budget plan | Y | N | |
| 2.3 | Monthly dashboard report as defined by Logan's Roadhouse | Y | N | |
| 2.4 | Quarterly review with Logan's Roadhouse to provide utilization statistics, financial results, narrative description of financial activity including identification of emerging trends | Y | N | |
| 2.5 | Actuarial consulting including pricing and plan design, reserving, and claim experience and financial analysis in accordance with quarterly accounting calendar | Y | N | Plan design, claim experience and financial analysis is prepared by Piper Jordan financial analysts. *Actuarial attestation* is provided via our partnership with Milliman. Four (4) IBNP projections have been included in our pricing. |
| 2.6 | Plan design analysis and modeling | Y | N | |
| 2.7 | Develop contribution strategy | Y | N | |
| 2.8 | Develop COBRA rates | Y | N | |
| 2.9 | Annual meeting with Logan's to provide utilization statistics, financial results, narrative description of financial activity including identification of emerging trends, vendor performance, and market changes | Y | N | |
| 2.10 | Benchmark plan designs and contributions | Y | N | |
| **3.0** | **CLINICAL AND WELLNESS** | | | |
| 3.1 | Development of multi-year strategy including implementation timeline | Y | N | |
| 3.2 | Provide ongoing analysis of programs identifying areas of opportunity | Y | N | |
| 3.3 | Provide recommendations for strategy refinement based on program outcomes | Y | N | |
| 3.4 | Assist with development of program components, including clinical program, lifestyle management, incentive programs, and employee engagement tools | Y | N | |
| 3.5 | Assist with integration of specialty vendors | Y | N | |
| 3.6 | Audit vendor-specific programs regarding outcomes and performance guarantees | Y | N | |

| | Service Description | Cost included in current annual budget (Y/N) | Cost included in 3 year budget (Y/N) | Outcomes/Additional Costs |
|---|---|---|---|---|
| **4.0** | **REPORTING** | | | |
| 4.1 | Work in collaboration with Logan's Roadhouse to develop a series of monthly, quarterly, and annual reports that will be outcome-focused to meet specific reporting needs | Y | N | |
| **5.0** | **VENDOR PROCUREMENT** | | | |
| 5.1 | Design and develop Requests for Proposal (RFP) as directed by Logan's Roadhouse | Y | N | |
| 5.2 | Manage RFP process through distribution, analysis, and negotiation via Piper Jordan's procurement tool | Y | N | |
| 5.3 | Present procurement results | Y | N | |
| 5.4 | Initiate and attend finalist meetings, including site visits | Y | N | |
| 5.5 | Medical procurement | Y | N | |
| 5.6 | Prescription drug procurement | Y | N | |
| 5.7 | Stop loss procurement | Y | N | |
| 5.8 | Dental procurement | Y | N | |
| 5.9 | Vision procurement | Y | N | |
| 5.10 | Voluntary benefit procurement | Y | N | |
| 5.11 | Life procurement | Y | N | |
| 5.12 | Disability and leave administration procurement | Y | N | |
| 5.13 | ADA accommodation procurement | Y | N | |
| 5.14 | COBRA and spending account procurement | Y | N | |
| 5.15 | EAP procurement | Y | N | |
| 5.16 | Wellness procurement | Y | N | |
| **6.0** | **NEGOTIATIONS** | | | |
| 6.1 | Provide technical financial analysis annually or as needed in preparation for renewals or new offerings | Y | N | |
| 6.2 | Negotiation of all rates and contracts or as needed | Y | N | |
| 6.3 | Face-to-face negotiation meetings as requested | Y | N | |
| 6.4 | Development of meaningful performance guarantees | Y | N | |
| **7.0** | **IMPLEMENTATION SERVICES** | | | |
| 7.1 | Complete and review applications, amendments, and endorsements for new and renewal lines of coverage | Y | N | |
| 7.2 | Confirm final rates and plan design | Y | N | |
| 7.3 | Coordinate delivery of enrollment materials | Y | N | |
| 7.4 | Manage delivery of ID cards (vendor coordination) | Y | N | |
| 7.5 | Manage the delivery of vendor benefit summaries, SBCs, certificates of coverage | Y | N | |

| | | | | |
|---|---|---|---|---|
| 7.6 | Coordinate transfer of historical data and transition of care | Y | N | |
| 7.7 | Coordinate administrative protocols with the insurers | Y | N | |
| 7.8 | Perform pre- and post-implementation audits, as needed | Y | N | |
| **8.0** | **CONTRACT REVIEW** | | | |
| 8.1 | Evaluate financial pricing terms, definitions, and measurement methodology on an annual basis | Y | N | |
| 8.2 | Evaluate performance guarantees on an annual basis | Y | N | |
| 8.3 | Confirm inclusion of agreed to services and administration | Y | N | |
| 8.4 | Confirm liability, indemnification and termination provisions in accordance with Logan's Roadhouse standards | Y | N | |
| 8.5 | Perform review of draft Summary Plan Description (final sign-off conducted by Logan's Roadhouse with ERISA counsel oversight) | Y | N | |
| **9.0** | **VENDOR MANAGEMENT** | | | |
| 9.1 | Assist Logan's Roadhouse with mapping of current Leave of Absence and Disability functions, to include vendor interfaces | Y | N | |
| 9.2 | Identify key gaps in current Leave of Absence and ADA Accommodation process | Y | N | |
| 9.3 | Recommend modifications in current processes to ensure that Logan's Roadhouse follows all local, state and federal regulations | Y | N | |
| 9.4 | Refine existing Logan's Roadhouse policies to ensure compliance with current regulations for Leave of Absence and ADA compliance | Y | N | |
| 9.5 | Work directly with Logan's Roadhouse stakeholders and vendors to ensure that processes are enacted to mitigate potential liability | Y | N | |
| 9.6 | Facilitate integration (data and discussions) between vendor(s) and Logan's Roadhouse | Y | N | |
| 9.7 | Create and manage project plan that identifies required tasks, timing, and resources | Y | N | |

| | SERVICE DESCRIPTION | Cost Included in Cost Currently Provided (Y/N) | Cost Included in Insurance or Add'l Fee (Y/N) | Comments/Additional Fees |
|---|---|---|---|---|
| 9.8 | Act as liaison with vendors for which we are designated Broker of Record and include plans for which we are not designated Broker of Record in strategic assessments and recommendations for Logan's | Y | N | |
| 9.9 | Review contracts, plan documents, amendments, insurance policies, and other plan related documents | Y | N | |
| 9.10 | Manage open issues and ensure timely resolution | Y | N | |
| 9.11 | Review billing structure to ensure set-up is accurate | Y | N | |
| 9.12 | Ensure new rates are delivered according to communicated deadline | Y | N | |
| 9.13 | Act as first point of contact for all day-to-day administrative issues and employee escalations as they arise | Y | N | |
| **10.0** | **LEGAL AND COMPLIANCE** | | | |
| 10.1 | Access to online Compliance Resource Center via Piper Jordan's account management team; Center focus includes ERISA, Cafeteria Plans, COBRA, HIPAA, ACA, Medicare, Mental Health Parity, and state-specific resources | Y | N | Piper Jordan's online Compliance Resource Center is HR360 |
| 10.2 | Coordinate collection of Schedule A information and prepare annual signature-ready 5500s | Y | N | Piper Jordan collects all Schedule A detail and works with 5500 Tax Group to complete timely signature-ready 5500s. |
| 10.3 | Monitor and provide information on pending or new legislation | Y | N | |
| 10.4 | Draft notices required to satisfy compliance responsibilities | Y | N | |
| 10.5 | Summary of Benefits and Coverage development | Y | N | |
| 10.6 | Summary Plan Description and Plan Document development and updates as required | Y | N | |
| 10.7 | Educational seminars and webinars | Y | N | |
| 10.8 | Monitor Logan's plan compliance, including HIPAA privacy requirements, SPD/SMM updates and distribution | Y | N | |
| 10.9 | Newsletters and special alert memos on pertinent issues | Y | N | |
| **11.0** | **COMMUNICATION** | | | |

| | | | | |
|---|---|---|---|---|
| 11.1 | Design open enrollment and new hire benefit communications including newsletters, emails, guides, post cards, etc.; English and Spanish supported | Y | N | Offered at no cost with placement of voluntary benefits. |
| 11.2 | Perpetual identification of communication opportunities for add-on vendor services | Y | N | Offered at no cost with placement of voluntary benefits. |
| 11.3 | Print and Fulfillment | Y | N | Offered at no cost with placement of voluntary benefits. |
| 11.4 | Design and host benefits microsite | Y | N | Offered at no cost with placement of voluntary benefits. Two (2) microsites have been assumed – a full-time microsite and a part-time microsite |
| 12.0 | ADMINISTRATION | | | |
| 12.1 | Member Advocacy Center: Enrollment counselors and perpetual Concierge support; English and Spanish supported | Y | N | Offered at no cost with placement of voluntary benefits. |
| 12.2 | QMSCO Qualification | Y | N | Offered at a discounted cost of $45 per qualification with placement of voluntary benefits. |
| 12.3 | QLE Administration | Y | N | Offered at no cost with placement of voluntary benefits. |
| 12.4 | Data Warehouse | N | N | Pricing varies by number of input and output files. Fee available after scoping call. |
| 12.5 | Pharmacy Audit | N | N | |
| 12.6 | Rebate Audit | N | N | |
| 12.7 | Annual Pharmacy Performance Analysis | N | Y | |

4. **Description of COMPANY Responsibilities:** To supply direction and feedback as needed.
5. **Period of time over which work will be performed:**
    A. **Initial Period:** April 1, 2018 through December 31, 2020

4819-6060-6568.2
18

6. **Compensation / Fees:**  In recognition of CONSULTANT's services provided to COMPANY, CONSULTANT may receive commissions from vendors on the following Core and Enhanced benefits:

A. Core Benefits
   i. Medical
   ii. Stop Loss
   iii. Dental
   iv. Vision
   v. Basic Life
   vi. Supplemental Life
   vii. Basic Accidental Death and Dismemberment
   viii. Supplemental Accidental Death and Dismemberment
   ix. Short Term Disability
   x. Long Term Disability
   xi. Accident
   xii. Critical Illness
   xiii. Dental
   xiv. Disability
   xv. Hospital Indemnity
   xvi. Group Indemnity Medical
   xvii. Universal Life
   xviii. Whole Life
   xix. Vision
   xx. Legal
   xxi. Auto/Home
   xxii. Pet Insurance

B. Enhanced Benefits
   i. Pharmacy